UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* John Klausmeier<br><br>　　　　　　　Relator,<br><br>　　　v.<br><br><br>General Dynamics Electric Boat<br>Corp.; W International, LLC; W<br>International SC, LLC; Precision<br>Material Handling Equipment, LLC;<br>Edward Walker. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.:<br><br>**SEALED COMPLAINT**<br>**(Jury Trial Demanded)**<br><br>FILED IN CAMERA<br>SEALED PURSUANT TO<br>31 U.S.C. § 3730(b)(2)<br><br>**DO NOT ENTER INTO**<br>**PACER**<br><br>**DO NOT PLACE IN PRESS**<br>**BOX** |

1

## Table of Contents

I.    Introduction .......................................................................................................... 6

II.   Jurisdiction and Venue ...................................................................................... 13

III.  Parties ................................................................................................................ 14

      A.  Relator John Klausmeier ........................................................................ 14

      B.  Plaintiff United States ........................................................................... 15

      C.  Defendant General Dynamics Electric Boat Corporation ..................... 16

      D.  Defendant W International ...................................................................... 17

      E.  Defendant W International SC ................................................................ 18

      F.  Defendant Precision Material Handling Equipment ............................ 20

      G.  Defendant Edward Walker ..................................................................... 20

IV.   The False Claims Act ........................................................................................ 21

V.    United States Navy's *Columbia* Class Submarine Project: Background, Fund-
      ing, and Defendants' Work on the Project ........................................................ 24

      A.  Background .............................................................................................. 24

      B.  Defendant Electric Boat Awarded Prime Contract .............................. 25

      C.  The Navy and Defendant Electric Boat Seek Suppliers ....................... 27

      D.  Defendants Walker, W International, and W International SC Receive
          More than $80 Million from the United States .................................... 30

          1.  Background of Defendants W International and W International
              SC ................................................................................................... 30

          2.  Relator is Hired to Work at the South Carolina Facility .......... 41

          3.  Defendant Electric Boat's Purchase Order and Award of Sup-
              plier Development Funds to Defendant W International SC ..... 42

2

        a. The W Defendants Apply for SDF Funding and Submit a Bid to Defendant Electric Boat ........................................ 43

                i. SDF Business Case Proposal.................................. 45

                ii. Offeror Certifications and Representations .......... 48

                iii. Signed Claw-Back Addendum ............................... 50

                iv. Detailed Cost Information ..................................... 53

                v. Equipment Quotes ................................................. 54

                vi. Commitment and Invoicing Schedule.................... 55

        b. The Purchase Order with Defendant Electric Boat ......... 55

        c. Supplements to the Purchase Order................................ 59

        d. Amount of SDF Payments Received by W International SC ...................................................................................... 66

    4. Defendant W International SC is Awarded Additional Funds Under the Defense Production Act ............................................. 67

        a. The Department of Defense Issues a FOA in July 2019.. 68

        b. The W Defendants Submit a White Paper in Response to the FOA ............................................................................ 68

        c. The Government Awards Defendant W International SC a Technology Investment Agreement and Requests a Proposal for DPA Funding ..................................................... 72

        d. The W Defendants Submit a Proposal for Approximately $55 Million in DPA Funding ............................................ 74

        e. Defendant W International SC is Awarded Approximately $55 Million in DPA Funds................................................ 79

  E. The W Defendants' Work on the Project ................................. 80

VI.     Factual Allegations Regarding Defendants' False Claims ............................. 82

A. Supplier Development Fund ................................................................. 82

　1. Defendants Walker, W International, and W International SC Grossly Inflated the Costs of their Welded Products .............. 82

　　a. Weld Tables ................................................................. 82

　　b. Weld Curtains ............................................................. 87

　2. Defendants Walker, W International, and W International SC Manipulated their Training Hours to Profit from Training Welders ...................................................................... 90

　3. Defendant Electric Boat Knew, or Should Have Known, About this Fraud ................................................................. 94

B. Defense Production Act ...................................................................... 98

　1. Defendants Walker, W International, W International SC, and PMHE Engaged in Bid Rigging and Grossly Inflated the Costs of Weld Tables ........................................................ 98

　2. Defendants Walker, W International, W International SC, and PMHE Grossly Inflated the Costs of Power Carts ................ 102

　3. Defendants Walker, W International, and W International SC Manipulated their Training Hours to Profit from Training Welders ...................................................................... 104

C. Defendants Walker, W International, and W International SC Retaliate Against Relator and Terminate His Employment ......................... 107

COUNT I (False Claims Act: Presenting or Causing the Presentation of False Claims) ................................................................................................. 111

COUNT II (False Claims Act: Use of False Record or Statement Material to a False Claim) ................................................................................................ 112

COUNT III (False Claims Act: Conspiring to Submit False Claims) ...................... 114

COUNT IV (False Claims Act: Submission of Express and Implied False Certifications) ................................................................................................ 115

COUNT V (False Claims Act: Conversion) ........................................................... 117

COUNT VI (False Claims Act: Retaliation) ............................................................. 118

PRAYER FOR RELIEF ............................................................................................ 120

DEMAND FOR JURY TRIAL .................................................................................. 120

NOW COMES Plaintiff-Relator John Klausmeier, by and through his attorney, and on behalf of the United States of America ("United States"), to recover losses from false claims submitted to the United States as a result of the sustained, fraudulent, and ongoing conduct of General Dynamics Electric Boat Corp.; W International, LLC; W International SC, LLC; Precision Material Handling Equipment, LLC; and Edward Walker, hereinafter collectively referred to as "Defendants."

## I. INTRODUCTION

1.     This action is brought under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), seeking treble damages and civil penalties.

2.     Defendant W International, LLC ("W International") is a metal fabrication company headquartered in Inkster, Michigan.

3.     Defendant Edward Walker ("Walker") is the Chief Executive Officer ("CEO") of Defendant W International, LLC

4.     In or about 2018, Defendant Walker decided to relocate Defendant W International's operations to South Carolina by leasing a large facility in Goose Creek, South Carolina.

5.     In December 2018, Defendant Walker incorporated Defendant W International SC, LLC ("W International SC") in South Carolina as a wholly owned subsidiary of Defendant W International.

6.     Upon information and belief, the purpose of this move was to secure contracts with the United States Government.

7. Upon information and belief, Defendant W International SC began operations in South Carolina in 2019, with a goal of securing contracts to fabricate parts for the construction of a fleet of *Columbia* class submarines for the United States Navy.

8. The prime contractor on that project is Defendant General Dynamics Electric Boat Co. ("Electric Boat").

9. Defendant W International SC—like many shipbuilding subcontractors—did not have the capital or manpower to handle a large subcontract on the submarine project.

10. The United States recognized that there was not a sufficient number of suppliers and skilled workers to satisfy the needs of the submarine project.

11. In an effort to expand the supplier base of subcontractors, Congress created a funding mechanism known as "Supplier Development Funds," which could be used to ensure that smaller suppliers have enough capital, training, and projects to contribute to large projects.

12. These Supplier Development Funds provided infusions of money to suppliers to train their employees and purchase equipment and materials.

13. Suppliers would then have sufficient trained labor and equipment to provide goods and services to Defendant Electric Boat and the United States for the construction of *Virginia* class and *Columbia* class submarines.

14. Electric Boat contracted with the government to administer Supplier Development Funds for a fixed fee and was responsible for administering them in accordance with the law.

15. The Government used the Supplier Development Funds to invest in supplier infrastructure so that it would be sufficient to construct nuclear submarines.

16. However, suppliers receiving Supplier Development Funds were not allowed to earn profits on the materials, services, or equipment procured with the funds.

17. In September 2019, Defendant Electric Boat entered into a Purchase Order with Defendant W International SC to purchase welding equipment and fund the training and qualification of welders.

18. Defendant W International SC was initially awarded approximately $ 5 Million in Supplier Development Funds from Electric Boat.

19. Within 45 days, that amount was increased to $25 Million to enable Defendant W International SC to meet the requirements of the Purchase Order with Defendant Electric Boat and subsequent government contracts.

20. Defendant W International SC—at the direction of, and in concert with, Defendant W International and Defendant Walker—committed fraud by using these Supplier Development Funds to profit on both the cost of goods sold to Defendant Electric Boat and the training of employees.

21. **First**, Defendant W International SC grossly inflated the price of the welded equipment being sold to Defendant Electric Boat.

22.    For example, Defendant Electric Boat purchased hundreds of Welding/Leveling Tables ("Weld Table").

23.    Defendant W International SC's cost to manufacture each Weld Table—including labor—was approximately $2,100.

24.    Defendant W International SC charged the United States—through its prime contractor, Defendant Electric Boat—$15,000 per Weld Table.

25.    **Second**, Defendant W International SC charged the United States—through its prime contractor, Defendant Electric Boat—for welding training and qualification.

26.    Defendant W International SC provided little training to its employees.

27.    Defendant W International SC instructed its employees to log training hours while working on fabrication projects—including Weld Tables—for the Purchase Order.

28.    The price of these projects *already included* labor hours.

29.    Therefore, Defendant W International SC was double invoicing the Government by being paid for training hours and labor hours at the same time.

30.    Given Defendant Electric Boat's experience in the shipbuilding industry, it knew or should have known that Defendant W International SC was grossly inflating the cost of its fabricated goods and double billing labor and training hours.

31.    As Defendant W International SC's work on the submarine project progressed, Defendants W International, W International SC, and Walker developed an additional way to defraud the Government.

9

32.    In June 2020, the United States entered into a Technology Investment Agreement with Defendant W International SC.

33.    This Agreement was valued at $55 Million and provided "funding to upgrade and expand existing facilities at W International SC LLC, which will enable increased capability and capacity for building of nuclear powered ships, retention and training of a skilled workforce and improved spacing of equipment to lower risk of COVID-19 in the workplace."

34.    The United States funded the Agreement through the Defense Production Act, which provides private companies with funding for production related to the national defense.

35.    Defendant W International SC—at the direction of, and in concert with, Defendant W International and Defendant Walker—again grossly inflated the cost of its welding equipment (including Weld Tables) and double billed the Government for training and labor hours.

36.    However, Defendant W International SC outsourced the production of some of the goods to other vendors.

37.    For example, the Government ordered 500 Weld Tables.

38.    Defendant W International SC obtained quotes from three vendors for the production of these Weld Tables: (1) Defendant Precision Material Handling Equipment ("PMHE"); (2) Scion Steel; and (3) Three D Metal Works.

10

39. The quote from Defendant PMHE was the lowest of the three vendors, and Defendant W International SC contracted with Defendant PMHE to purchase 500 Weld Tables at a price of $14,950 per Weld Table.

40. Upon information and belief, the actual cost of these Weld Tables was approximately $1,000 each.

41. Upon information and belief, Defendant PMHE is not, however, an independent vendor that provided a competitive quote to Defendant W International SC.

42. Defendant PMHE is a wholly owned subsidiary of Defendant W International.

43. Defendant PMHE's Registered Agent is Defendant Walker—the CEO of Defendant W International SC and Defendant W International.

44. Defendant PMHE also shares a physical address with W International in Inkster, Michigan.

45. Upon information and belief, Defendant W International SC deliberately obtained three inflated quotes, with the quote of its sister company—Defendant PMHE—being the lowest.

46. Upon information and belief, Defendant W International SC engaged in bid rigging to further increase its profits and conceal its inflated material costs and labor costs.

47. Additionally, Defendant W International SC again double billed the Government for products that it fabricated in house by having welders-in-training

work on projects where Defendant W International SC was already being paid labor costs by the Government.

48.     In short, the United States provided Defendant W International SC with more than $80 Million so that it would have adequate facilities, sufficient equipment, and trained staff to fulfill contracts on the *Columbia* class submarine project and other government projects.

49.     But, upon information and belief,  rather than using this money for training and equipment, Defendant W International SC used these governmental funds to pay operational expenses and allowed company executives to pocket millions of dollars.

50.     Therefore, when Defendant W International SC was awarded shipbuilding construction projects for the *Columbia* class submarine project, its staff was unprepared, untrained, and unqualified.

51.     As a result, the quality of Defendant W International SC's products suffered greatly, which has jeopardized the efficient production of the submarine fleet and jeopardized the lives of workers and sailors.

52.     Relator voiced concerns with Defendant Walker, Defendant W International, and Defendant W International SC's (collectively, "the W Defendants") failure to implement the training, quality control, and inspections required by Defendant W International SC's contracts with the United States and Defendant Electric Boat.

53.     Relator also voiced concerns about the W Defendants' misappropriation of Government funds.

54.    The W Defendants retaliated against Relator by demoting him from Chief Operating Officer ("COO") to Chief Quality Officer and then terminating his employment.

55.    Defendants' conduct—beginning at least as early as 2019—violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and caused significant financial harm to the Navy's *Columbia* class submarine project and jeopardized the integrity of critically important military hardware upon which the Government relies for the national defense.

## II. JURISDICTION AND VENUE

56.    Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

57.    This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3730(b) and 3732(a).

58.    This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.

59.    At all times material to this Complaint, Defendants regularly conducted substantial business within the State of South Carolina, maintained permanent employees and offices in South Carolina, and made and are making significant sales within South Carolina.

60.    Defendants are thus subject to personal jurisdiction in South Carolina.

61.    Venue lies in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because one or more Defendants reside in and/or has transacted business within this Court's jurisdiction, and the acts set out herein occurred in this district.

13

62.     Venue lies in this division because one or more of the Defendants reside in and/or has transacted business within this Court's jurisdiction, and the acts set out herein occurred in this division.

63.     There has been no public disclosure of the "allegations or transactions" in this Complaint as contemplated by 31 U.S.C. § 3730(e).

64.     Relator is an original source of the information alleged in this Complaint and has voluntarily provided this information to the United States prior to filing this Complaint.

### III.     PARTIES

65.     Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

#### A.  Relator John Klausmeier

66.     Relator John Klausmeier is a resident of the State of Michigan

67.     Relator has a Bachelor of Applied Science from Michigan State University and completed coursework towards a Master of Business Administration from Oakland University.

68.     Relator has experience working in the automotive engineering, aerospace, and defense industries.

69.     In January 2013, began working for Defendant W International as a Quality Manager and became Vice President of Quality and Program Management.

70.     In September 2014, Relator was promoted to COO of Defendant W International.

14

71.    Relator later became President of Defendant W International.

72.    In 2018, Defendant Walker incorporated Defendant W International SC—a subsidiary of Defendant W International—in South Carolina in order to secure and perform contracts with the United States Navy and large military contractors like Defendant Electric Boat.

73.    On June 25, 2019, Defendant Walker offered Relator a position as COO of Defendant W International SC.

74.    Relator accepted the position and relocated to South Carolina.

75.    After voicing concerns about the conduct of the W Defendants in performing the contract with Defendant Electric Boat, the W Defendants changed Relator's job title to Chief Quality Officer.

76.    In September 2021, Jim Logan—the President of Defendant W International SC—told Relator that he was being terminated as an employee.

77.    Relator's employment with Defendant W International SC terminated on October 31, 2021.

78.    As a result of his work at Defendant W International SC, Relator Klausmeier has firsthand knowledge about Defendants' fraudulent conduct.

### B. Plaintiff United States

79.    The United States of America (hereinafter "United States") is recovering on behalf of its agencies and departments, including, but not limited to, the Department of Energy, Department of the Navy, Department of the Air Force, and Department of Defense.

80. The United States of America contracts with private shipbuilders—such as Defendant Electric Boat—to construct ships and submarines for the United States Navy.

### C. Defendant General Dynamics Electric Boat Corporation

81. Defendant General Dynamics Electric Boat Corporation ("Electric Boat") is a Delaware corporation with its principal place of business in Groton, Connecticut.

82. Defendant Electric Boat is a subsidiary of General Dynamics Corporation.

83. Electric Boat is a part of the Marine Systems segment of General Dynamics Corporation.

84. Defendant Electric Boat has been the primary shipbuilder for submarines for the United States for approximately 100 years.

85. Defendant Electric Boat built the world's first nuclear-powered submarine—the USS *Nautilus*—in the 1950s.

86. Defendant Electric Boat also built the United States' first ballistic missile submarine—the USS *George Washington*—in the 1950s.

87. Defendant Electric Boat is one of only two submarine manufacturers in the United States.

88. The other submarine manufacturer is Newport News Shipbuilding in Virginia.

16

89. Defendant Electric Boat constructed the United States' current fleet of ballistic missile submarines—the *Ohio* class submarines.

90. Defendant Electric Boat designed and is currently building the United States' new fleet of ballistic missile submarines—the *Columbia* class submarines.

91. As detailed below, Defendant Electric Boat knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States in connection with the design and construction of the *Columbia* class submarines.

### D. Defendant W International

92. Defendant W International is a limited liability company organized and existing under the laws of the State of Michigan.

93. Defendant W International's principal place of business is 26700 Princeton Street, Inkster, Michigan 48141.

94. Defendant W International's Registered Agent is Defendant Walker.

95. Defendant W International's CEO is Defendant Walker.

96. Defendant W International was formerly known as Vivid Industries, LLC until September 24, 2013.

97. Defendant W International's website describes it as "an advanced metal fabricator dedicated to serving our people, our clients, and our country."[1]

---

[1] https://w-international.com/company.

98.    Defendant W International provided welding and fabrication services for the United States—through Government contractors—and private companies in the defense, energy, and aerospace industries.

99.    Until 2019, Defendant W International operated in Michigan.

100.   In 2018 and 2019, Defendant W International was financially struggling and carrying significant debt.

101.   Defendant W International applied for, and obtained, a certificate of authority to transact business in South Carolina on December 6, 2018.

102.   Defendant Walker and Defendant W International created a wholly owned subsidiary—Defendant W International SC, LLC—and opened a large fabrication facility in Goose Creek, South Carolina.

103.   Defendant W International closed its facility in Michigan when it opened Defendant W International SC's facility in South Carolina.

104.   Although Defendant W International SC is a subsidiary of Defendant W International, Defendant Walker treats the companies as alter egos of one another.

105.   As detailed below, Defendant W International knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States in connection with the design and construction of the *Columbia* class submarines.

### E.  Defendant W International SC

106.   Defendant W International SC is a limited liability company organized and existing under the laws of the State of South Carolina.

107.    Defendant W International SC was incorporated in in South Carolina on December 4, 2018.

108.    Defendant Walker is the CEO of Defendant W International SC.

109.    Defendant W International SC's principal place of business is 2040 Bushy Park Road, Goose Creek, SC 29445.

110.    Upon information and belief, Defendant W International SC is a wholly owned subsidiary of Defendant W International.

111.    Although Defendant W International SC is a subsidiary of Defendant W International, Defendant W International SC is the alter ego and operational arm of Defendant W International.

112.    Defendant Walker treats Defendant W International and Defendant W International SC as if they were the same entity.

113.    Upon information and belief, Defendant Walker created Defendant W International SC for the purpose of garnering Government contracts.

114.    Upon information and belief, Defendant Walker created Defendant W International SC so that he could sell it while still being able to operate the parent company under the "W International" brand.

115.    As detailed below, Defendant W International SC presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States in connection with the design and construction of the *Columbia* class submarines.

19

### F. Defendant Precision Material Handling Equipment

116.  Defendant PMHE is a limited liability company organized and existing under the laws of the State of Michigan.

117.  Defendant PMHE's principal place of business is 26700 Princeton Street, Inkster, Michigan 48141.

118.  Defendant PMHE's Registered Agent is Ed Walker.

119.  Upon information and belief, Defendant Walker is Defendant PMHE's CEO and majority owner.

120.  Leona Burja is the President of Defendant PMHE and Defendant Walker's sister.

121.  Defendant PMHE is a wholly owned subsidiary of Defendant W International.

122.  As detailed below, Defendant PMHE presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States in connection with the design and construction of the *Columbia* class submarines.

### G. Defendant Edward Walker

123.  Upon information and belief, Defendant Walker is a citizen and resident of the State of Michigan.

124.  Upon information and belief, Defendant Walker is the CEO of Defendant W International, Defendant W International SC, and Defendant PMHE.

20

125.    Upon information and belief, Defendant Walker is the primary decision-maker for Defendant W International, Defendant W International SC, and Defendant PMHE.

126.    As detailed below, Defendant Walker presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States in connection with the construction of the *Columbia* class submarines and other government contracts.

## V.    THE FALSE CLAIMS ACT

127.    Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

128.    The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).

129.    The FCA provides, in pertinent part, that a person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (a)(1)(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
>
> (a)(1)(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;
>
> . . .

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990[2] (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

130.    For purposes of the False Claims Act,

the terms "knowing" and "knowingly"—(A) mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

131.    The term "claim" "means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property" that:

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance

---

[2] By virtue of 28 C.F.R. § 85.3(a)(9), the penalty range for violations occurring on or before November 2, 2015, has increased to a minimum of $5,500 and a maximum of $11,000 per violation. The penalties have continually been adjusted for inflation, and the minimum penalty is currently $11,803 and the maximum penalty is $23,607 per violation.

a Government program or interest, and if the United States Government—

> (I) provides or has provided any portion of the money or property requested or demanded; or

> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

*Id*. § 3729(b)(2).

132.    "[T]he term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment . . . ." *Id*. § 3729(b)(3).

133.    "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id*. § 3729(b)(4).

134.    The FCA also contains an anti-retaliation provision, which states: "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." *Id*. § 3730(h)(1).

V.   **UNITED STATES NAVY'S** *COLUMBIA* **CLASS SUBMARINE PRO-JECT: BACKGROUND, FUNDING, AND DEFENDANTS' WORK ON THE PROJECT**

135.   Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

A.   **Background**

136.   The United States employs a three-part nuclear deterrent strategy involving ground-based intercontinental ballistic missiles, airborne heavy bombers, and sea-based ballistic missiles.

137.   The sea-based strategic deterrent is comprised of more than 200 submarine-launched ballistic missiles that are carried on ballistic missile submarines ("SSBNs").

138.   Currently, the sea-based strategic nuclear deterrent is provided by 14 Ohio class SSBNs.

139.   The Navy commissioned the lead ship of the *Ohio* class SSBN fleet in 1981.

140.   The Navy plans to begin to retire the *Ohio* class SSBNs in 2027.

141.   Given the age and dated technology in the SSBN fleet, the United States commissioned the design and construction of a new fleet of nuclear-powered ballistic submarines.

142.   The United States commissioned the design and manufacture of 12 *Columbia* class SSBNs ("the Project").

24

143.    Each of the *Columbia* class SSBNs will carry 16 missile tubes, equating to a total of 192 available tubes for nuclear ballistic missiles.

144.    "Between fiscal year 2031–2040, the Navy plans to have a mix of 10 operationally available Columbia and Ohio class submarines."[3]

145.    "In fiscal year 2041, with the retirement of the final Ohio class submarine, this is to increase to 11 Columbia class, and finally to 12 operationally available Columbia class submarines by fiscal year 2042."[4]

**B. Defendant Electric Boat Awarded Prime Contract**

146.    In 2014, Congress created the National Sea-Based Deterrence Fund, which provides the Department of Defense with various mechanisms to contract for the purchase of sea-based deterrence vessels. *See* 10 U.S.C. § 2218a.

147.    "Since then, Congress has provided the Navy with enhanced acquisition authorities to buy and construct submarines and certain key components early, in bulk, and continuously."[5]

148.    Initially, the Navy planned to invest approximately $128 billion to research, develop, and purchase replacement vessels for the *Ohio* class SSBN fleet.

149.    The Navy planned to introduce new technologies for the *Columbia* class SSBNs, while also "leveraging systems from existing submarine programs—the

---

[3] United States Government Accountability Office, *COLUMBIA CLASS SUBMARINE Immature Technologies Present Risks to Achieving Cost, Schedule, and Performance Goals* (December 2017) at 5, https://www.gao.gov/assets/gao-18-158.pdf [hereinafter, "2017 GAO Report"].

[4] *Id.*

[5] *Id.* at 14.

Virginia and Seawolf attack submarines and the Ohio class SSBNs—in order to ensure commonality with the submarine fleet and reduce development needs for the Columbia class to limit technical risk."[6]

150.    "Two shipbuilders—General Dynamics Electric Boat (Electric Boat) and Huntington Ingalls Industries Newport News (Newport News)—design and build nuclear submarines."[7]

151.    "The Navy awarded a detail design contract in September 2017 to Electric Boat for work including completion of the submarine's design, component and technology development, and prototyping efforts."[8]

152.    The Department of Defense announced Defendant Electric Boat's "$5,071,534,074 cost-plus-incentive-fee with special incentives contract" on September 21, 2017.[9]

153.    The contract—N00024-17-C-2117 ("the Prime Contract")—"was not competitively procured in accordance with 10 U.S. Code 2304(c)(1)" because "only General Dynamics Electric Boat currently possesses the entirety of the nuclear ballistic missile submarine design/engineering workforce and data environment to support completion of the highly specialized submarine design products and integration

---

[6] *Id.* at 6.

[7] United States Government Accountability Office, *COLUMBIA CLASS SUBMARINE Overly Optimistic Cost Estimate Will Likely Lead to Budget Increases* (April 2019) at 7, https://www.gao.gov/assets/gao-19-497.pdf [hereinafter, "2019 GAO Report"].

[8] *Id.*

[9] https://www.defense.gov/News/Contracts/Contract/Article/1320411/.

efforts required to meet all of the contemplated technical and schedule contract requirements."[10]

154.    Therefore, Defendant Electric Boat "is the prime contractor for both design and construction of the Columbia class program, with Newport News serving as a subcontractor."[11]

155.    "Similar to the Virginia class program, each shipbuilder will construct segments of the submarine, but Electric Boat will complete final outfitting and deliver the submarines to the Navy."[12]

156.    The Naval Sea Systems Command in Washington, D.C. is the contracting authority.

### C. The Navy and Defendant Electric Boat Seek Suppliers

157.    On November 5, 2020, Defendant Electric Boat announced that the Navy had awarded it a $9.474 billion contract modification for the construction and testing of the first and second *Columbia* class SSBNs.

158.    In its November 5, 2020 announcement, Defendant Electric Boat stated:

> Electric Boat has been making preparations for construction of the Columbia class for nearly a decade, including advancing the design of this critical Navy asset, hiring and training thousands of skilled tradespeople, modernizing our facilities and helping to bolster the supply base.

---

[10] *Id.*

[11] 2019 GAO Report at 7.

[12] *Id.*

159.    In order to fulfill the Prime Contract (and modifications), Defendant Electric Boat had to find smaller companies to manufacture parts for the Project.

160.    Due to a significant increase in Naval shipbuilding—including the Project—"the supplier base that supports these shipbuilding programs is facing a surge in demand for materials."[13]

161.    "However, this supplier base has diminished in size over prior decades."[14]

162.    In a 2021 report about the Project, the Government Accountability Office stated:

> According to the shipbuilders' planning documents and program officials, the number of suppliers that can support Navy shipbuilding programs has shrunk by roughly 70–80 percent since the 1970s and 1980s when the Navy last procured two submarines concurrently. A shipbuilder document states that the number of suppliers has decreased from a prior number of 17,000. Program officials told us that the number of suppliers is now roughly 5,000. According to shipbuilder planning documents, the consequence of this reduction has been an increased reliance on sole-source suppliers and a reduced number of suppliers that compete for contracts. The shipbuilders and Navy deemed a certain subset of suppliers to be critical to shipbuilding programs based on assessments of three primary areas of supplier performance: capability, capacity, and cost.[15]

---

[13] United States Government Accountability Office, *COLUMBIA CLASS SUBMARINE Delivery Hinges on Timely and Quality Materials from an Atrophied Supplier Base* (January 2021) at 9, https://www.gao.gov/assets/gao-21-257.pdf [hereinafter, "2021 GAO Report"].

[14] *Id.*

[15] *Id.*

28

163.    "Since 2017, Congress has provided funds for the expansion and development of the submarine supplier base."[16]

164.    The purpose of this funding was to ensure that smaller suppliers have enough capital, training, and projects to assist Defendant Electric Boat with fulfilling the Prime Contract.

165.    These funds are known as "Supplier Development Funds" ("SDF").

166.    SDFs are used for two purposes in connection with the Project:

1. ***Direct investments in suppliers:*** money provided to suppliers to address validated shortfalls in their facilities, machinery, and skilled workers to reduce risk, and;

2. ***Material purchases to signal demand:*** purchases of materials designed to help the supplier base better predict their workload and optimize use of their facilities.[17]

167.    Upon information and belief, the Navy has used a majority of SDFs on direct investments in the supplier base, purchase equipment, conduct training, and develop alternative suppliers.

168.    Congress has appropriate substantial sums of money to assist the Navy with SDFs.

169.    For example, "in fiscal years 2019 and 2020[,] the Navy received $451.6 million in funding as part of Columbia class submarine advance procurement funds

---

[16] *Id.*

[17] *Id.* at 41.

29

that it budgeted to ensure that suppliers can meet increased production require-ments."[18]

170.    Under the terms of the Project's Prime Contract, Defendant Electric Boat "is administering the distribution of the majority of this funding on behalf of the Navy."[19]

171.    Upon information and belief, Defendant Electric Boat contracted with hundreds of suppliers in order to meet the demands of the Prime Contract and modifications.

172.    Defendant W International SC is one of the suppliers that received SDFs in order to provide products and services to Defendant Electric Boat for the Project.

**D. Defendants Walker, W International, and W International SC Receive More than $80 Million from the United States**

**1. Background of Defendants W International and W International SC**

173.    Defendant W International is a metal fabrication and production company that has operated in Michigan since approximately 2013.

174.    Defendant W International contracted with private companies and Government contractors to provide welding and fabrication services in the defense, energy, and aerospace industries.

175.    Defendant W International completed many projects for Defendant Electric Boat and other Government contractors.

---

[18] *Id.* at 9.

[19] *Id.*

176. In 2018 and 2019, Defendant W International was struggling financially.

177. In 2018 and 2019, Defendant W International was, at times, unable to make payroll.

178. In 2018 and 2019, Defendant W International was behind on paying its suppliers and vendors.

179. Upon information and belief, in 2018 and 2019, Defendant W International was in debt to Comerica Bank for millions of dollars.

180. Upon information and belief, Defendant Walker believed that contracting with the Government or Government contractors could solve Defendant W International's financial difficulties.

181. Defendant Walker knew that Defendant Electric Boat had received a multi-billion-dollar design and construction contract for the *Columbia* class submarines.

182. Defendant Walker knew that Newport News Shipbuilding was the prime subcontractor on the Project.

183. On or about 2018, Defendant Walker decided to move Defendant W International's production to South Carolina.

184. The purpose for this move was to obtain contracts with Defendant Electric Boat, Newport News Shipbuilding, and other Government contractors.

185.   A move to the Charleston, South Carolina area would allow Defendant W International to have a facility with barge access to transport fabricated products to Government contractors.

186.   Defendant Walker located a vacant building at 2040 Bushy Park Road, Goose Creek, South Carolina ("the South Carolina Facility") that he wanted to purchase.

187.   Upon information and belief, the South Carolina Facility was previously owned by General Dynamics.

188.   Defendant W International hired several consultants to help it secure Government contracts.

189.   One of these consultants was a former employee of Defendant Electric Boat.

190.   That consultant recommended that Defendant W International purchase the South Carolina Facility, as it had barge access and had been previously used by Defendant Electric Boat.

191.   Given Defendant W International's financial condition, Defendant Walker had difficulty finding financing for the South Carolina Facility.

192.   Defendant Walker sought purchase orders from Defendant Electric Boat and Newport News Shipbuilding.

193.   Neither company would give Defendant Walker any significant purchase orders in 2018.

32

194. Defendant Walker asked Defendant Electric Boat and Newport News Shipbuilding to furnish Letters of Intent that he could use to attempt to obtain financing for the South Carolina Facility.

195. On December 5, 2018, Defendant Walker received a Letter of Intent from Newport News Shipbuilding.

196. The Letter stated:

Dear Mr. Walker:

Newport News Shipbuilding (NNS) has current contracts, and anticipates being awarded future multi-billion dollar contracts by the Department of Defense, to design and build FORD Class Aircraft Carriers and VIRGINIA and COLUMBIA Class submarines. These contracts will require strategically sourcing significant production work by NNS to qualified suppliers.

W International has demonstrated strong leadership and an extensive plan to meet the competitive cost, quality and delivery expectations of NNS. W International is developing a formidable manufacturing site with barge access in the Charleston, SC area to support provision of large structural assemblies. Furthermore, W International is one of the few approved suppliers for complex/critical onboard assemblies with government approved HY80 weld procedures.

NNS understands that W International intends to make significant investments which will allow it to, among other things, become a significant supplier to NNS in providing parts and components for aircraft carrier and submarine construction. These investments include the purchase of 2040 Bushy Park, Goose Creek, South Carolina, extensive renovations, the purchase of the latest technology fabrication equipment, significant investment int raining, and the hiring of experienced naval fabricators and managers.

It is NNS' intent to source to and hire W International to provide structural fabrication and manufacturing of components in connection with NNS' development and manufacturing of FORD Class Aircraft Carriers and VIRGINIA and COLUMBIA Class submarines. NNS anticipates awards to our combined supply base of approximately 200,000 man hours of work 2019, 500,000 for 2020, 900,000 for 2021 and up to

33

1,500,000 for 2022 and thereafter. NNS considers that W International is well positioned for a significant portion of this work. Example of components that could be considered include fixtures, decking, foundations, hangers, bedplates, rails, girders, bulkheads, structural units, super structures, nonferrous tanks and HY80 shipboard tanks and components (collectively, "Products").

Award of purchase orders to W International will depend on multiple factors, including:

- (a)    NNS continuing to receive construction contracts from the Department of Defense,
- (b)    W International providing competitive rates to support a case for award,
- (c)    W International's ability to build based on NNS provided design disclosure documentation
- (d)    W International's ability to meet NNS' stringent quality standards
- (e)    Insufficient manpower and footprint at NNS to meet production requirements and deadlines

Furthermore, NNS will assist W International, as reasonably as possible, in receiving (a) up to $30 million of supplier reconstitution funds made available by the Department of Defense and the Department of Navy associated with the COLUMBIA class submarine advanced procurement for fiscal year 2019, and (b) industrial base growth investment funds ("Capex Investment").

NNS understands that W International may at any time enter into manufacturing contracts for products which may or may not be similar to the Products and NNS shall not be considered W International's sole customer. W International retains the unconditional right to manufacture goods for other customers. Notwithstanding anything to the contrary in this paragraph, W International shall prioritize work for NNS over work for other customers should a conflict between competing purchase orders arise.

We agree that our companies have not entered into any binding agreement and neither company will be under obligation until both parties sign formal, binding written agreements in the future. Furthermore, the parties agree that the terms of any definitive agreements will include all clauses required by law or regulation and NNS' prime contract and any other mutually agreeable clauses, terms and conditions as set forth

34

in NNS' applicable appendices. Please countersign below to indicate the agreement of your company to the terms of this letter.

197.    The Letter was signed by John Temple (Vice President of Newport News) and Bryan Caccavale (Vice President, Strategic Sourcing of Newport News).

198.    Upon information and belief, Defendant Walker signed this Letter of Intent.

199.    Two days later, on December 7, 2018, Defendant Walker received a Letter of Intent from Defendant Electric Boat.

200.    The Letter stated:

Dear Mr. Walker:

Electric Boat has current contracts, and anticipates being awarded future multi-billion dollar contracts by the Department of Defense, to design and build VIRGINIA and COLUMBIA Class submarines. These contracts will require strategically sourcing significant production work by Electric Boat to qualified suppliers.

W International has a history of meeting the competitive cost, quality and delivery expectations of EB. W International has completed and delivered on over 60 contracts to EB. Furthermore, W International is one of the few approved suppliers for complex/critical onboard assemblies with government approved HY80 weld procedures.

Electric Boat understands that W International intends to make significant investments which will allow it to, among other things, increase its support of Electric Boat in providing parts and components for submarine construction. These investments include the purchase of 2040 Bushy Park, Goose Creek, South Carolina, extensive renovations, the purchase of the latest technology fabrication equipment, significant investment in training, and the hiring of experienced naval fabricators and managers.

It is Electric Boat's intent to source to and hire W International to provide structural fabrication and manufacturing of components in connection with EB's development and manufacturing of VIRGINIA and COLUMBIA Class submarines. Electric Boat anticipates that awards to W

35

International could result in at least 250,000 man hours of work for 2019, 500,000 for 2020, and 750,000 for 2021 and thereafter. Example of components that could be considered include fixtures, decking, foundations, hangers, bedplates, rails, girders, bulkheads, pressure vessels, super structures, nonferrous tanks and HY80 shipboard tanks and components (collectively, "Products").

Award of purchase orders to W International will depend on multiple factors, including:

(a)     Electric Boat continuing to receive construction contracts from the Department of Defense,

(b)     W International providing competitive rates to support a case for award,

(c)     W International's ability to build based on Electric Boat provided design disclosure documentation

(d)     W International's ability to meet Electric Boat's stringent quality standards

Furthermore, Electric Boat will assist W International, as reasonably as possible, in receiving (a) up to $30 million of supplier reconstitution funds made available by the Department of Defense and the Department of Navy associated with the COLUMBIA class submarine advanced procurement for fiscal year 2019, and (b) industrial base growth investment funds ("Capex Investment").

Electric Boat understands that W International may at any time enter into manufacturing contracts for products which may or may not be similar to the Products and Electric Boat shall not be considered W International's sole customer. W International retains the unconditional right to manufacture goods for other customers. Notwithstanding anything to the contrary in this paragraph, W International shall prioritize work for Electric Boat over work for other customers should a conflict between competing purchase orders arise.

We agree that our companies have not entered into any binding agreement and neither company will be under obligation until both parties sign formal, binding written agreements in the future. Please countersign below to indicate the agreement of your company to the terms of this letter.

36

201.    The Letter was signed by T. Blair Decker (Defendant Electric Boat's Vice President of Supply Chain, Materials and Strategic Sourcing) and John V. Leonard, Jr. (Defendant Electric Boat's Vice President & Chief Financial Officer).

202.    Upon information and belief, Defendant Walker signed this Letter of Intent.

203.    Defendant Walker obtained a certificate of authority for Defendant W International to conduct business in South Carolina on December 6, 2018.

204.    Defendant Walker also incorporated a subsidiary company—Defendant W International SC—to be the operational arm of Defendant W International in South Carolina.

205.    During 2018, Defendant Walker was unable to find traditional financing for the South Carolina Facility.

206.    The South Carolina Facility is owned by Cooper River Partners LLC.

207.    Upon information and belief, Cooper River Partners LLC, is owned by Pacolet Milliken.

208.    When Defendant Walker was unable to find traditional financing through a bank, Cooper River Partners agreed to lease the South Carolina Facility.

209.    Upon information and belief, Defendant Walker created an LLC in South Carolina for the sole purpose of being the tenant of the South Carolina Facility—Vivid Empire SC, LLC.

210.    Upon information and belief, Defendant Walker incorporated Vivid Empire SC, LLC with the South Carolina Secretary of State on December 11, 2018.

37

211. Upon information and belief, Vivid Empire SC serves no purpose and does no business other than serving as the tenant for the South Carolina Facility.

212. Upon information and belief, Vivid Empire SC is a wholly owned subsidiary of Defendant W International.

213. On December 28, 2018, Cooper River Partners, LLC entered into a lease with Vivid Empire SC, LLC.

214. The initial term of the lease was twenty (20) years.

215. Upon the expiration of the initial term, the lease "renew[s] automatically, unless [Vivid Empire SC, LLC] provides two years' written notice to [Cooper River Partners, LLC] of non-renewal, for up to six successive twenty year renewal terms . . . ."

216. The lease required Vivid Empire SC, LLC to pay: (a) $200,000 per month in rent for the first three years of the lease; (b) $250,000 per month in the fourth and fifth year; and (c) $300,000 per month from the fifth year to the tenth year of the lease.

217. After the tenth year of the lease, "the Rent shall be adjusted upward (but not downward) by the GDP Adjustment."

218. The lease was a triple net lease, which imposed obligations on Vivid Empire SC to pay all expenses for the South Carolina Facility, including, but not limited to, taxes, operating expenses, insurance, and maintenance.

219. On January 1, 2019, Vivid Empire SC, LLC entered into a triple net lease with Defendant W International SC for the South Carolina Facility.

220.    The document is called a "Lease"; however, upon information and belief, it is a sublease because Vivid Empire SC, LLC does not own the South Carolina Facility.

221.    The sublease had a term of 20 years.

222.    Defendant W International SC agreed to pay a total amount of $61,291,814.04 in monthly installments pursuant to a written rent schedule.

223.    The rent schedule required Defendant W International SC to pay approximately $200,000 per month in the first year.

224.    The monthly rent amount increased every year, with a total monthly rent of $319,649.91 in the final year of the sublease.

225.    Defendant W International SC moved into the South Carolina Facility in January 2019.

226.    During the first few months of 2019, Defendant W International SC prepared the South Carolina Facility to be ready to handle Defendant W International's production and fabrication projects.

227.    Vivid Empire SC invoiced Defendant W International SC for rent every month starting in January 2019.

228.    Defendant W International SC pays Defendant W International a monthly management fee for accounting services and overlapping personnel.

229.    In 2019, Defendant W International SC paid Defendant W International $611,975 in management fees.

230. In 2020, Defendant W International SC paid Defendant W International $666,000 in management fees.

231. Upon information and belief, Defendant Walker sets the amount of the management fee.

232. Defendant W International SC began fabricating and manufacturing products for Defendant W International in 2019.

233. The W Defendants continued to work towards securing purchase orders for the Project from Defendant Electric Boat and Newport News.

234. Defendant W International's move to South Carolina received media attention.

235. Berkeley County announced, on December 11, 2018, that Defendant W International was moving its "production operations" to Berkeley County and was making a $35.2 million capital investment [that] is projected to create more than 600 new jobs."[20]

236. The news release stated:

Headquartered in Madison Heights, Mich., W International serves the aerospace, defense, energy and marine industries. Within the defense sector, in addition to combat vehicles, the company supports U.S. Navy platforms, such as submarines, aircraft carriers and frigates. The company's highly-trained staff also supports requirements associated with a diverse range of materials, including ballistic armor, aluminum, titanium and other high-strength steels.

Located at the Charleston International Manufacturing Center at Bushy Park, W International's new, 451,000-square-foot facility will provide manufacturing, customer fabrication, project management,

---

[20] https://berkeleymeansbusiness.com/w-international-creating-more-than-600-jobs-in-berkeley-county/.

tooling and engineering services to clients in the aerospace, defense, automotive, energy and commercial business industries. Hiring for the new positions is projected to begin in January 2019, and interested applicants can visit the company's careers page online. According to a press release with on the Company's website, a second phase will begin soon which could provide more new job announcements in addition to the 600 new jobs already projected.[21]

237.    The Coordinating Council for Economic Development "approved job development credits, as well as a $2 million Set Aside grant to Berkeley County to assist with the costs of the project."[22]

### 2.  Relator is Hired to Work at the South Carolina Facility

238.    Relator moved to South Carolina to begin working at the South Carolina Facility in April 2019.

239.    Relator was the COO of Defendant W International at the time he moved to South Carolina.

240.    Relator focused on upfitting the South Carolina Facility, purchasing equipment and fixtures, and hiring qualified labor.

241.    On June 25, 2019, Defendant Walker offered Relator a position as the COO of Defendant W International SC.

242.    The job offer letter is on Defendant W International letterhead and offers Relator employment "on behalf of W International, LLC" with a start date of July 8, 2019.

---

[21] *Supra* note 20.

[22] *Supra* note 20.

243. As COO, Relator worked with Defendant Walker and other executives to obtain Government contracts for Defendant W International SC.

244. Relator was also charged with managing the operations of the South Carolina Facility.

245. In order to fulfill the substantial requirements of Government contracts, Relator was tasked with obtaining the proper production and fabrication equipment and ensuring that Defendant W International SC had a trained and qualified work force.

### 3. Defendant Electric Boat's Purchase Order and Award of Supplier Development Funds to Defendant W International SC

246. The W Defendants were struggling financially when the South Carolina Facility was opened.

247. The W Defendants were carrying significant debt and—at times—had difficulties making payroll and paying suppliers for material and services.

248. The W Defendants needed to obtain Government contracts and infrastructure and operational funding from the Government to be able to sustain the South Carolina Facility.

249. The W Defendants' plan was centered around obtaining a purchase order from Defendant Electric Boat for work on the Project.

250. The W Defendants knew that they did not have the operational capacity or trained staff to be able to produce any of the large components for the Project.

### a. The W Defendants Apply for SDF Funding and Submit a Bid to Defendant Electric Boat

251. The W Defendants began working with Defendant Electric Boat to secure SDF funding for the South Carolina Facility.

252. On August 8, 2019, Defendant Electric Boat issued a Request for Proposal ("RFP") for Supplier Development Funding to Defendant W International SC.

253. The RFP Number was BF220-048.

254. On or about September 3, 2019, the W Defendants submitted Proposal/Quote Number 190261 in response to Defendant Electric Boat's RFP.

255. The RFP began with an "Overview" section:

In 2018, the United States Government sought and obtained funding via the Fiscal Year 2019 National Defense Authorization Act (FY19 NDAA) authorizing additional funds for submarine industrial base expansion to ensure second- and third-tier General Dynamics Electric Boat Corporation (EB) suppliers are able to meet increased production requirements to support the construction schedules of the COLUMBIA and VIRGINIA Class Submarine programs. This effort is referred to as "Supplier Development" and the associated funding is referred to as "Supplier Development Funding" (SDF).

The FY19 NDAAA SDF was included on a modification to EB's COLUMBIA Class IPPD Contract which updated the Statement of Work for Supplier Development efforts stating: "The Contractor [EB] shall support industrial base expansion through the use of investments in facilities, fixtures, and capability development and vendor qualification effort."

Electric Boat (herein referred to as the Buyer), is soliciting a business case proposal for the award of FY19 NDAA Supplier Development Funding. W International (herein referred to as the Seller), must submit a fully supported business case proposal to the Buyer for review to be considered for this funding.

256. The RFP outlined the scope of work requested, the responsibilities of the parties, the schedule, payment policies, and other information about the project.

43

257.     The RFP contained a "Claw-Back" Provision:

The Buyer has a contractual obligation with the United States Government to include a "claw-back" provision in each PO associated with SDF. The Buyer will also include claw-back provisions in every subsequent PO related to assured supply that is issued to the Seller within the period of performance specified in the "claw-back" provision. The Buyer will assist the Government in recovery of funds and/or property should a subcontractor fail to execute a development project as agreed. The definition of failure to execute will follow as standard/subcontract terms.

The "claw-back" provision is entered into in addition to the Buyer's standard terms and conditions if a PO for SDF is issued. Notwithstanding anything to the contrary herein or in the potential SDF PO, if any inconsistencies are identified or should arise between the "claw-back" provision and any of the potential SDF PO documents, the "claw-back" provision shall take precedence.

The Buyer may unilaterally revoke prior approval if the Seller significantly fails to meet the criteria specified in the not to exceed provision and the approved business case proposal. If the Seller significantly fails to meet the criteria specified in Section 3, the Buyer shall be eligible to recover from the Seller all or any portion of any payments paid to the Seller. The Buyer shall determine if any project significantly fails to meet the criteria specified in the agreement, and may request that the Seller repay all or any portion of any amount(s) paid to the Seller. The Seller will retain title to property acquired as a result of the award established by the Buyer with the Seller (see "Supplier Development Fund Addendum" attachment ("Claw-Back" Provision)).

SDF shall not be used for the cost of maintenance of equipment, or labor associated with using the equipment.

As seller invoicing is to be monthly and is to include all costs incurred, the use of financing options with sub tier equipment suppliers is not permitted. Any equipment/facility improvements made prior to the award of this PO will not qualify for SDF.

258.     The W Defendants submitted six attachments to Defendant Electric Boat in their bid response to the RFP on September 3, 2019:

- SDF Business Case Proposal;

44

- Offeror Certifications and Representations;

- Signed Claw-Back Addendum;

- Spreadsheet with Detailed Cost Information;

- Equipment Quotes; and

- Spreadsheet of Commitment and Invoicing Schedule.

### i. SDF Business Case Proposal

259. The W Defendants' September 2019 Business Case Proposal that contained a written description of their intended use for the SDF funds.

260. The Business Case Proposal detailed the W Defendants' request for: (1) $38.4 Million of general use fabrication equipment; and (2) $49.7 Million for a 60,000 square foot machine shop with four specialized mills.

261. The Business Case Proposal began with an Executive Summary that stated what the W Defendants expected to accomplish with SDF funding:

> W International intends to use the SDF to facilitize a newly acquired manufacturing site dedicated to supporting US Navy shipbuilding.

> W International has been leaning forward in regard to investing to support the increase in US Navy shipbuilding. In December 2018, W International closed on the purchase of a 45 acre heavy manufacturing facility in Goose Creek, South Carolina (just north of Charleston). The secured site provides 441,391 square feet of indoor manufacturing space, an on-site deep water barge slip, and a large blast and paint facility.

> The company has been in discussion with EB about the purchase, development, and use of the site since early 2018. Plans for the use of supplier development funding, including letters of intent signed in December 2018 by EB and Newport News Shipyard (NNS), have been reviewed and revised multiple times over the past year to provide the shipyards and the US Navy the most capable facility possible to support large component fabrication needs.

45

W International expects to use the SDF to accelerate facilitization of the newly acquired site in South Carolina. In addition to facilitizing quicker, W International expects to add equipment and capabilities that would not be possible without the SDF. The funded equipment and resources will allow W International to provide up to 2.75 million man hours of fabrication and welding labor per year in support of EB, Newport News Shipbuilding (NNS), and the US Navy.

Currently W International is subletting many support operations such as material processing and machining because the needed equipment is not available on site. Funding much of this equipment will significantly lessen the reliance on outside sources which will provide quality, schedule, and cost improvements by eliminating the efforts and inefficiencies involved with shipping material and managing sub tiers.

W International expects two major benefits as the result of using SDF:

- Immediate facilitization of a world class manufacturing shop with modern equipment dedicated to US Navy shipbuilding needs

- Ability to maintain extremely competitive rates for arguably unmatched capacity and capability at a single site by keeping the cost of the equipment out of W International's rates

262.   The W Defendants stated that the "sole purpose of purchasing the facility in South Carolina was to support EB, NNS, and the US Navy."

263.   The W Defendants described the cost savings to the Government that would result from providing SDF funding:

The benefits of investing supplier development funding with W International are far reaching.

Investments made with supplier development funds will allow W International to continue to provide competitive rates by reducing the amount of capital that will be included in the burden rate if W International were to have to invest in the equipment. Without an established backlog of work and without knowing what value of SDF may be awarded, it is not possible to quantify the actual savings at this time.

The use of the funds to provide modern equipment will immediately increase efficiency and reliability which will reflect in less man-hours quoted and lower costs to the customer. With proper funding and subsequent production awards, W International will be able to offer over 1 million man-hours of capacity by the end of 2020 increasing to 2.75 million man-hours annually over a 5 year period. This will save the government and EB significant costs and efforts trying to develop multiple smaller shops over the coming years, as the majority of needed outsourced work can be executed at a single shop dedicated to supporting US Navy shipbuilding.

In total, the combination of lower rates, increased efficiency, and a smaller supplier base to manage will multiply the cost benefit of investing SDF at W International.

By providing SDF, W International will be able to obtain all equipment needed to fully facilitize the site in South Carolina and provide maximum capacity to the US NAVY immediately (by mid-2020). If SDF is not provided, W International will need to procure the same equipment over a much longer period of time, delaying the available capacity to EB and the US Navy and greatly reducing the qualified bargeable capacity within the industrial base. In addition to improved capacity, new equipment purchased with SDF will directly improve efficiency which correlates to improved schedule performance.

264.    The W Defendants also explained that their "submitted list of requested SDF equipment likely differs in nature from those of other suppliers. Whereas most suppliers may be looking to add a specific piece of equipment to gain a unique capability, W International is requesting a variety of general processing, welding, and material handling equipment to accelerate [its] ability to provide substantial metal processing and fabrication capacity to the shipbuilding market."

265.    The Business Case Proposal provided a schedule with the following "key dates":

|        |                                    |
|--------|------------------------------------|
| 9/6/19 | Award of Initial $5M SDF order     |
| 9/6/19 | Sellers submit SDF business case proposals |

47

11/1/19          EB completes review of proposals (8 weeks)

12/2/19          Contract Award and Kick Off Meeting (30 days)

12/3/19          First Purchase Orders Placed for Equipment

266.    The Business Case Proposal stated that an itemized cost of the requested elements were provided in a detailed cost spreadsheet.

267.    The W Defendants quoted "[i]nternal work and training hours . . . at W International's rate of $95/hr."

268.    The W Defendants certified that they were "willing and able to support any necessary audits of the cost basis information."

## ii. Offeror Certifications and Representations

269.    The W Defendants submitted a form titled "Offeror Certifications and Representations" ("Certification Form") to Defendant Electric Boat.

270.    The W Defendants certified that they took "NO exceptions to the contractual requirements" of Defendant Electric Boat's RFP.

271.    The Certification Form contained a section titled, "Certificate of Independent Price Determination."

272.    That section stated:

The offeror makes the following certification if a firm-fixed-price contract or fixed-price contract with economic price adjustment contract is contemplated.
(a) The offeror certifies that –
    (1) The prices in this offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder, offeror, or competitor relating to –
        i.   those prices;
        ii.  the intention to submit an offer; or

48

iii. the methods or factors used to calculate the prices offered.

(2) The prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law; and

(3) No attempt has been made or will be made by the Offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

(b) Each signature on the offer and this certification is considered to be a certification by the signatory that the signatory –

(1) Is the person in the Offeror's organization responsible for determining the prices being offered in this bid or proposal, and that the signatory has not participated and will not participate in any action contrary to paragraphs (a)(1) through (a)(3) of this provision; or

(2)

i. Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to paragraphs (a)(1) through (a)(3) of this provision _____ [insert full name of person(s) in the Offeror's organization responsible for determining the prices offered in this bid or proposal, and the title of his or her position in the Offeror's organization];

ii. As an authorized agent, does certify that the principals named in subdivision (b)(2)(i) above have not participated, and will not participate, in any action contrary to paragraphs (a)(1) through (a)(3) of this provision; and

iii. As an agent, has not personally participated, and will not participate, in any action contrary to paragraphs (a)(1) through (a)(3) of this provision.

(c) If the Offeror deletes or modifies subparagraph (a)(2) of this provision, the Offeror must furnish with its offer a signed statement setting forth in detail the circumstances of disclosure.

273. The language of the Certificate of Independent Price Determination is derived from the Federal Acquisition Regulations ("FAR") and is codified at 48 C.F.R. § 52.203-2.

49

274.    In the Certification Form, the W Defendants ("Offeror") certified that: "Pricing is on an individual line item basis and Offeror will accept an order for any or all of the line items at the prices quoted."

275.    The W Defendants agreed "to allow [Defendant Electric Boat] to perform an audit of Offeror's proposal to establish price reasonableness in accordance with the FAR."

276.    The Certification Form was signed by Kurt Kilby—an employee of Defendant W International and/or Defendant W International SC—on August 15, 2019.

277.    By signing the Certification Form, Mr. Kilby agreed to the following Certification by an Official of Offeror or Offeror's Authorized Representative:

> By submitting this information, I am attesting to the accuracy of the information contained herein. I understand that I may be subject to penalties imposed by the United States Government if I misrepresent any of the representations or certifications herein. I further acknowledge on behalf of Offeror that [Defendant Electric Boat] shall rely on the information provided by Offeror herein and that if any of Offeror's representations herein change during the period of performance, Offeror shall provide immediate written notice to the [Defendant Electric Boat's] representative to whom this document was originally provided. By signing below, I certify that I am duly authorized to sign this document on behalf of Offeror and that to the best of my knowledge, the information provided in this document is current, accurate, and complete as of the date set forth below.

278.    The Certification Form was transmitted to Defendant Electric Boat on September 3, 2019.

### iii. Signed Claw-Back Addendum

279.    The W Defendants submitted to Defendant Electric Boat a Supplier Development Fund Addendum ("the Addendum").

50

280.    The Addendum contains several recitals, which outline the scope and purpose of SDF Funding.

281.    The Addendum states that Defendant Electric Boat ("Buyer") has selected Defendant W International SC ("Seller") "to receive the Funds to expand Seller's capabilities to support production requirements for Buyer's Government Contracts . . . ."

282.    The Addendum first states how the W Defendants must use the SDF funds:

1.  Seller agrees that it shall complete/procure/secure/perform the investment in a manner compliant with Purchase Order #[23] _____ and in accordance with the mutually agreed upon Reference X schedule.

2.  Seller shall ensure that all equipment procured with Funds provided under Purchase Order # _____ are kept in good working order and are maintained in accordance with all required maintenance and care instructions. Buyer or Buyer's Navy Customer shall be entitled to records of equipment maintenance upon request. Seller shall be responsible for all costs associated with equipment maintenance and any required repair or refurbishment. Seller understands and agrees that the Funds provided under Purchase Order # _____ are solely for the purpose of the Investments, as identified in the Statement of Work ("SOW"). *The Funds shall not be used for any other purpose unless specifically agreed to in writing by the authorized representatives of the Buyer and Seller. Additionally, Seller shall not charge profit on any of the materials, services, tooling, or equipment procured with the Funds for the Investments.* Buyer or Buyer's Navy Customer may audit all proposal documentation in advance of receipt of funding under this Addendum.

3.  Seller shall use consistent accounting practices to account for funds and Buyer, or Buyer's customer, shall have the right to audit accounting records regarding expenditure of the Funds

---

[23] The Addendum has "SNF157=110" handwritten by each of the blanks in the Addendum. As detailed below, that is the number of the $5 Million Purchase Order that Defendant Electric Boat awarded Defendant W International SC on September 18, 2019.

51

at any time. Seller shall provide invoices for all materials, services, tooling, equipment or other items procured in furtherance of procurement of the Investment. If Seller is provided with advance funding or funding based on estimates/quotes and the Seller does not exhaust all funding provided by Buyer for the Investments, any remaining funding shall be refunded to Buyer. Additionally, if the Seller is provided with advance funding, the Funds shall be kept in a separate account and Seller shall not comingle the Funds with any other accounts.

(emphasis added).

283.    The Addendum required the W Defendants to "produce supplies, *at a reasonable cost*, and at the required quantity, quality, specifications, and schedule for the Government, Electric Boat Corporation, and/or Huntington Ingalls Incorporated . . . ." (emphasis added).

284.    The Addendum imposes reporting requirements on Defendant W International SC.

285.    The Addendum also contains a "Claw-Back Clause," which states:

1.  If Seller breaches any of its obligations under this Addendum or any of its obligations under any Applicable Purchase Order, or if Seller becomes insolvent or suffers a material, adverse change in financial conditions, Buyer may hold Seller in material breach, and Seller agrees that Buyer shall have the right to exercise any of the following remedies at Buyer's sole discretion:
    a.  Require Seller to return Funds in an amount equal to Buyer's initial investment;
    b.  Require Seller to return Funds at the current market value to replace the Investment;
    c.  Require Seller to return Investment property to Buyer (or directly to its Navy Customer, as may be required ;)
    d.  At no additional cost to the Buyer, allow Buyer, Buyer's Representative(s)(e.g. Buyer subcontractors), or Buyer's Navy Customer use of the equipment at/in Seller facilities to complete scheduled deliveries; or,

52

e. Any combination of the above.

2. **Indemnity.** Seller shall indemnify and hold Buyer, Buyer's parent, and affiliates and their respective officers, directors, employees, and customers harmless for all costs, expenses (including reasonable attorney's fees which may be incurred) associated with enforcement of any required remedy action.

286. The Addendum stated that "Seller's obligations . . . shall continue for a period of ten (10) years. Until the expiration of the aforementioned period, Buyer may exercise the remedies available to it in this Addendum or in the Applicable Purchase Order if Seller fails to perform any of its obligations."

287. The RFQ Addendum was signed by Matt Hines—Defendant W International SC's Vice President of Programs—on August 30, 2019.

**iv. Detailed Cost Information**

288. The W Defendants submitted a detailed cost spreadsheet ("the SDF Cost Spreadsheet") in its response to the RFP.

289. The SDF Cost Spreadsheet included the following information for each line item: (1) priority; (2) category; (3) description of equipment/materials; (4) the company that provided the quote; (5) the unit cost; (6) the quantity requested; (7) the total cost; (8) the planned date of purchase; (9) cost and quantity breakdowns for 2019–21; and (10) the justification, benefit, and product supported.

290. The SDF Cost Spreadsheet was the document that was the basis for the SDF awards that Defendant Electric Boat made to the W Defendants.

291. Most of the line items are equipment that would be provided by a vendor or supplier.

53

292.   Those equipment line items provided information about the external vendor or supplier's quote.

293.   Some of the line items were for products that the W Defendants would fabricate, such as Weld Curtains and Weld Tables.

294.   The cost of those fabricated line items was estimated by the W Defendants based on the cost of materials and the cost of labor (at $95 per hour).

295.   The SDF Cost Spreadsheet also included requests for the training and qualification of welders.

### v.  Equipment Quotes

296.   The W Defendants submitted documentation to Defendant Electric Boat to support their pricing for the line items in the SDF Cost Spreadsheet.

297.   For goods to be purchased from vendors or suppliers, the W Defendants provided written quotes.

298.   For training/qualification of employees, the W Defendants created written quotes detailing the costs of labor and materials.

299.   These quotes were signed by Matt Hines—Defendant W International SC's Vice President of Programs.

300.   For fabricated goods, such as Weld Curtains and Weld Tables, the W Defendants created written quotes detailing the costs of labor and materials.

301.   These quotes were signed by Matt Hines

### vi. Commitment and Invoicing Schedule

302.    The W Defendants submitted a commitment and invoicing schedule to Defendant Electric Boat in response to the RFP.

303.    The document contains an invoicing schedule with a breakdown of monthly cost for each line item in the SDF Cost Spreadsheet.

304.    The document contains a commitment schedule with a breakdown of monthly cost for each line item in the SDF Cost Spreadsheet.

305.    The document contains how many weeks of lead time is needed for each line item in the SDF Cost Spreadsheet.

### b.  The Purchase Order with Defendant Electric Boat

306.    On September 18, 2019, Defendant Electric Boat issued a Purchase Order to Defendant W International SC—Purchase Order Number: SNF157=110 ("the Purchase Order").

307.    Defendant Electric Boat agreed to purchase ten line items from the SDF Cost Spreadsheet:

| Item # | Item Description | Number of Items | Cost |
|---|---|---|---|
| 56 | Pulse Mig Welding Systems | 75 | $710,354.01 |
| 57 | Tig Welding Systems | 4 | $86,354.68 |
| 58 | Stud Welding Systems | 4 | $140,000 |
| 59 | Mechanized Mig Weld Systems | 2 | $113,300 |
| 60 | Induction Heating Systems | 5 | $383,236.15 |
| 61 | Weld Curtains | 398 | $597,000 |
| 62 | Welding/Leveling Tables | 102 | $1,530,000 |
| 63 | Training and Qualification of Welders | 75 | $1,140,000 |
| 64 | Weld Procedure Qualifications | 8 | $228,000 |
| 65 | NDT Qualification and Training | 5 | $76,000 |
| | **TOTAL COST:** | | $5,004,244.84 |

55

308. The Purchase Order had a "Not to Exceed" cost of $5,004,245.

309. The Purchase Order states that Defendant Electric Boat relied on the W Defendants' Business Case Proposal, the SDF Cost Spreadsheet, and the RFP.

310. The Purchase Order imposed the following responsibilities on Defendant W International SC:

SELLER RESPONSIBILITY INCLUDES, BUT IS NOT LIMITED TO:

* EXECUTING ON ANY FACILITY UPGRADES, EQUIPMENT PURCHASES/UPGRADES, AND/OR OTHER INVESTMENTS NEEDED TO INCREASE FACILITY CAPACITY AND CAPABILITY AS DESCRIBED IN SELLER'S BUSINESS CASE PROPOSAL.
* COMPLETION OF ALL DELIVERABLES IN ACCORDANCE WITH CONTRACTUAL REQUIREMENTS.
* PRIORITIZATION OF RESOURCES TO MEET AND IMPROVE ON CONTRACTED DELIVERY SCHEDULES OF BUYER'S FUTURE WORK.

311. The Purchase Order required a duly authorized representative of Defendant W International SC to certify every invoice in accordance with Standard Clause 17-102V.

312. Standard Clause 17-102V states:

Invoices for work done under this purchase order shall specify the number of hours worked by the Seller's employees. Invoices shall be submitted monthly, in quadruplicate, referencing this purchase order, all copies of invoices shall be certified by a duly authorized representative of the Seller with respect to this purchase order as follows:

"I hereby certify that the above bill is correct and reasonable and that payment thereof has not been received and that the bill is presented with the knowledge that the amount paid hereunder will become the basis for a charge against the United States Government for costs incurred under prime contracts with the Navy."

At any time or times prior to final payment under this purchase order, Electric Boat Corporation may cause to be made such audit(s) of applicable invoices, vouchers, timesheets and/or direct charges as Electric Boat Corporation may deem required. Each payment previously made shall be subject to reduction to the extent of amounts which are found by the Government not to have been properly payable and shall also be subject to reduction for overpayments or to increase for underpayments, of preceding invoices or vouchers.

Payments of fixed fee shall be made to the Seller as the work progresses in amounts invoiced until eighty-five percent (85%) of the fixed fee has been paid. Seller shall not invoice for the remaining fee until (I) all work has been completed and accepted, (II) an audit (if required by the Buyer) has been completed, and (III) the final price of the order has been negotiated and the order supplemented accordingly. Seller's final invoice must be accompanied by an acceptable release of claims.

The Seller and each assignee under assignment in effect at the time of final payment, shall execute and deliver, at the time of, and as a condition precedent to final payment, a release in form and substance satisfactory to the Government, discharging the Electric Boat Corporation and the Government, their officers, agents, and employees from liabilities, obligations, and claims arising under this purchase order.

Electric Boat Corporation may withhold final payment hereunder until the requirements of the above paragraph have been fulfilled and until patent and property security clearances, if necessary, have been provided to Electric Boat Corporation.

313.    The Purchase Order permits Defendant Electric Boat to request audits of incurred project costs at any time prior to final payment.

314.    The Purchase Order states that Defendant Electric Boat has a "contractual obligation with the United States Government to include a 'claw-back' provision in each [Purchase Order] associated with Supplier Development Funding (SDF)."

315.    The Purchase Order stated that "SDF shall not be used for the cost of maintenance of equipment, or labor associated with using the equipment."

316.   The Purchase Order required Defendant W International SC to "affirm in writing that they will not bill Supplier Development costs twice (e.g., as direct charge against Supplier Development PO and again as overhead in potential future procurements)."

317.   The Purchase Order stated that Defendant W International SC was not exempt from CAS accounting.

318.   The Purchase Order required Defendant W International SC's total costs to "be reasonable, allocable to this order, and consistent with sound and generally accepted accounting principles and practices."

319.   The Purchase Order required Defendant W International SC to submit reports with sufficient detail to allow monitoring by Defendant Electric Boat.

320.   Because the Purchase Order was for a fixed price, Defendant W International SC agreed to "submit a fixed-price proposal, cost or pricing data supporting that quotation, and to allow an audit by Electric Boat and/or [Defense Contract Audit Agency] if requested."

321.   Matt Hines acknowledged receipt and acceptance of the Purchase Order on behalf of Defendant W International SC on October 2, 2019.

322.   Defendant W International SC performed a Contract Review, which was completed on November 4, 2019.

323.   Upon information and belief, Defendant Electric Boat paid Defendant W International SC for the items listed in the Purchase Order.

### c. Supplements to the Purchase Order

324.   On October 28, 2019, Defendant Electric Boat issued Supplement 1 to the Purchase Order.

325.   In Supplement 1, Defendant Electric Boat agreed to purchase an additional $20,117,423 in line items from the SDF Cost Spreadsheet.

326.   With the addition of Supplement 1, Defendant Electric Boat committed to pay Defendant W International SC $25,121,668 in SDF funding.

327.   Defendant W International SC agreed to "submit a fixed-price proposal, cost or pricing data supporting that quotation, and to allow an audit by Electric Boat and/or DCAA if requested."

328.   Defendant W International SC also agreed to "submit a progress report which shall be as detailed as necessary to demonstrate that all aspects of the Purchase Order requirements have been reviewed and addressed and allows accurate monitoring by the Buyer."

329.   Supplement 1 added SDF funding in support of 39 line items in the SDF Cost Spreadsheet, including, *inter alia*:

- Item #46: Weld Curtains (101)
- Item #47: Weld/Leveling Tables (80)
- Item #48: Training and Qualifications of Welders (75)
- Item #55: NDT Qualification and Training (5) (800 Hours)

330.   Supplement 1 included Standard Clause 17-102V, which states:

Invoices for work done under this Purchase Order shall specify the number of hours worked by the Seller's employees. Invoices shall be

submitted monthly, in quadruplicate, referencing this Purchase Order. All copies of invoices shall be certified by a duly authorized representative of the Seller with respect to this Purchase Order as follows:

"I hereby certify that the above bill is correct and reasonable and that payment thereof has not been received and that the bill is presented with the knowledge that the amount paid hereunder will become the basis for a charge against the United States Government for costs incurred under prime contracts with the Navy."

331.    Defendant W International SC acknowledged receipt and acceptance of Supplement 1 to the Purchase Order on November 4, 2019.

332.    Matt Hines signed the Purchase Order Acknowledgement on behalf of Defendant W International SC.

333.    Defendant W International SC conducted and signed a Contract Review on November 4, 2019.

334.    Upon information and belief, Defendant Electric Boat paid Defendant W International SC for the items listed in Supplement 1.

335.    On January 21, 2020, Defendant Electric Boat issued Supplement 2 to the Purchase Order.

336.    Supplement 2 contained a number of modifications to the line items purchased by Defendant Electric Boat.

337.    Supplement 2 modified Standard Clause 17-102V to remove the words "fixed fee."

338.    Defendant W International SC acknowledged receipt and acceptance of Supplement 2 to the Purchase Order on January 23, 2020.

339. Matt Hines signed the Purchase Order Acknowledgement on behalf of Defendant W International SC.

340. Defendant W International SC conducted and signed a Contract Review on January 29, 2020.

341. On May 18, 2020, Defendant Electric Boat issued Supplement 3 to the Purchase Order.

342. Supplement 3 contained a number of modifications to the line items purchased by Defendant Electric Boat, including the addition, deletion, and change in per item pricing for some of the line items.

343. The total pricing for the Purchase Order did not change.

344. All other terms and conditions of the Purchase Order, as supplemented, remained "the same and in full force and effect."

345. Defendant W International SC acknowledged receipt and acceptance of Supplement 3 to the Purchase Order on May 21, 2020.

346. The Purchase Order Acknowledgement was signed by Defendant W International SC's Director of Business Development Operations.

347. Defendant W International SC conducted and signed a Contract Review on May 21, 2020.

348. On June 3, 2020, Defendant Electric Boat issued Supplement 4 to the Purchase Order.

349. Supplement 4 was an internal supplement "issued for Electric Boat Corporation internal use only."

350.   Defendant W International SC acknowledged receipt and acceptance of Supplement 4 to the Purchase Order on June 19, 2020.

351.   The Purchase Order Acknowledgement was signed by Defendant W International SC's Director of Business Development Operations.

352.   Defendant W International SC conducted and signed a Contract Review on June 19, 2020.

353.   On June 25, 2020, Defendant Electric Boat issued Supplement 5 to the Purchase Order.

354.   Supplement 5 contained a modification to the invoicing procedure.

355.   Defendant W International SC acknowledged receipt and acceptance of Supplement 5 to the Purchase Order on June 29, 2020.

356.   Matt Hines signed the Purchase Order Acknowledgment on behalf of Defendant W International SC.

357.   Defendant W International SC conducted and signed a Contract Review on June 29, 2020.

358.   On December 23, 2020, Defendant Electric Boat issued Supplement 6 to the Purchase Order.

359.   "The purpose of Supplement 006 to th[e] Purchase Order [was] to definitize pricing in the amount of $25,121,668."

360.   Supplement 6 stated: "Per Standard Clause 17-45V, Release of Claims to be submitted at time of final invoice."

361.   Standard Clause 17-45V stated:

Upon completion and final acceptance of all work required hereunder, the amount then due to the Seller under this order will be paid upon presentation of a complete, correct, properly executed, and duly certified invoice and, after Seller furnishes Buyer with a release, if required, of all claims against Buyer arising under or by virtue of the order. The release reflected below must be completed in its entirety, and submitted with Seller's final invoice in order to avoid delays in payment.

Release of Claims
Against
Electric Boat Corporation

Whereas, the work and services provided under Electric Boat Purchase Order No. _____ dated _____, as supplemented, entered into between Electric Boat Corporation ("Buyer") and _____ ("Seller") have been completed and all matters with respect to the administration of said Purchase Order have been satisfactorily and finally settled within the terms thereof; and

(Choose One)

Whereas, by Supplement No. _____ the Purchase Order price has been/will be (choose one) (increased or decreased) by the amount of _____ and _____/100 ($_____) dollars, to a final firm fixed-price of $_____. or,

Whereas, the total firm fixed-price of this Purhcase Order (sic) is and remains $ _____.

Now therefore, in consideration of the final payment made/to be made, Seller, for itself, its successors and assigns, hereby releases Electric Boat and its officers, agents and employees, and the United States of America and its officers and employees, from any and all claims, demands and liabilities whasoever in connection with or in any way arising out of said Purchase Order.

Seller certifies that it has paid all laborers, materialmen, subcontractors and any other indebtedness connected with the work and that no liens have been placed or are anticipated to be placed on the property to which the order pertains.

By signing below, I certify that I am an officer, owner or otherwise a duly authorized agent of the certifying company or entity ("Seller") who may bind the Seller and sign this document on behalf of the Seller.

63

I further certify that to the best of my knowledge, all of the information given in this document is current, accurate and complete as of the date of my signing below.

I understand and agree that misrepresentation of the facts shall, in addition to any other remedies available at law or in equity, be cause for buyer to terminate for default any work being performed or to be performed.

I acknowledge and agree on behalf of the Seller that all of the information herein is material; that Buyer will be relying on the information and certifications provided by the Seller herein and that if any of Seller's information and representations herein change during the period of performance, Seller shall provide immediate written notice to Buyer's materials management representative.

362. Defendant W International conducted and signed a Contract Review on December 12, 2021.

363. Upon information and belief, Defendant W International SC submitted a final invoice to Defendant Electric Boat.

364. Upon information and belief, the final invoice contained a signed Release of Claims in accord with Standard Clause 17-45V.

365. During Defendant W International SC's performance of the Purchase Order, as supplemented, it certified that it was complying with the terms of the Purchase Order and Federal Acquisition Regulations.

366. For example, on December 22, 2020, Defendant W International SC completed a Certificate of Current Cost or Pricing Data.

367. This Certificate stated:

This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in section 2.101 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.403-4) submitted,

64

either actually or by specific identification in writing, to the Contracting Officer or to the Contracting Officers representative in support of **\*EB Purchase Order SNF157=110** are accurate, complete, and current as of **\*\*December 22, 2020**. This certification includes the cost or pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are part of the proposal.

368.    Matt Hines—then the Chief Business Officer of Defendant W International SC—signed this Certificate on or about December 22, 2020.

369.    Upon information and belief, Defendant Electric Boat paid Defendant W International SC approximately $25 Million in SDF funding pursuant to the Purchase Order, as supplemented.

370.    Upon information and belief, the W Defendants certified their compliance with the Purchase Order (as supplemented), federal law, and federal regulations each time they submitted an invoice for payment.

371.    Upon information and belief, the United States' payment decisions were based on these certifications.

372.    Upon information and belief, the United States authorized the payment of these SDF funds based on, *inter alia*:

- Defendant W International SC's submissions and certifications in response to Defendant Electric Boat's RFP;

- Defendant W International SC's cost breakdown in the SDF Cost Spreadsheet and line item quotation documents;

- Defendant W International SC's certifications that it was it complying with the Purchase Order, as supplemented;

- Defendant W International SC's certifications that it was complying with the applicable Standard Clauses of the Purchase Order, as supplemented;

- Defendant W International SC's certifications that it was complying with CAS accounting;

- Defendant W International SC's certifications that it was complying with the Federal Acquisition Regulations;

- Defendant W International SC's certifications with each invoice that its bills were "correct and reasonable";

- Defendant W International SC's certifications in the Claw-Back Agreements;

- Defendant W International SC's certifications and assurances that it was not profiting on the SDF funding;

- Defendant W International SC's certifications that its total costs were reasonable and "consistent with sound and generally accepted accounting principles and practices";

- Defendant W International SC's Release of Claims.

373. Each of these documents, certifications, and/or assurances was independently material to the Government's decision to pay Defendant W International SC SDF funding.

374. As discussed below, the W Defendants' certifications were—in many cases—false and fraudulent.

### d. Amount of SDF Payments Received by W International SC

375. According to Defendant W International SC's 2020 Financial Statement, it received $11,425,601 in SDF funds in 2019.

376. According to Defendant W International SC's 2020 Financial Statement, it received $13,468,067 in SDF funds in 2020.

**4. Defendant W International SC is Awarded Additional Funds Under the Defense Production Act**

377.    In 2020, the W Defendants sought approximately $55 Million in Government funding to expand the South Carolina Facility and its manufacturing capacity.

378.    The Defense Production Act ("DPA") is a federal law that was initially enacted in 1950 in response to the Korean War.

379.    The DPA gives the President broad authority to ensure that essential domestic industrial resources are available to support national defense and homeland security.

380.    DPA Title III provides direct funding and subsidiaries to private companies to assist them in developing their production capabilities.

381.    The Government announces DPA funding opportunities by issuing a Funding Opportunity Announcement ("FOA").

382.    In order to receive DPA funding through an Open FOA, a company can submit a "White Paper."

383.    United States Government personnel and agencies then review the White Papers.

384.    If the Government determines that a valid need within the scope of the DPA exists, it may request that an offeror submit a formal proposal.

385.    After reviewing the formal proposal and supporting documentation, the DPA Title III Executive Agent program office contacts successful recipients.

### a. The Department of Defense Issues a FOA in July 2019

386. In July 2019, the Air Force Research Laboratory Materials and Manufacturing Directorate, AFRL/RX at Wright-Patterson Air Force Base ("Wright-Patt") in Ohio issued a FOA.

387. The FOA Number was: FA8650-19-S-5010.

388. The W Defendants viewed the DPA as a means to have the Government continue to fund their operations and capital expenditures.

389. The FOA stated that Wright-Patt was soliciting white papers on three project topic areas:

    a. **Sustainment of Critical Production:** Efforts to create, maintain, protect, expand, or restore industrial base capabilities essential for national defense.

    b. **Commercialization of Research and Development (R&D) Investments:** Efforts to transition Government sponsored R&D to commercial applications; and from commercial R&D to national defense applications.

    c. **Scaling of Emerging Technologies:** Efforts for the increased use of emerging technologies in national security program applications and the rapid transition of emerging technologies.

### b. The W Defendants Submit a White Paper in Response to the FOA

390. The W Defendants viewed the this DPA as a means to have the Government continue to fund their operations, expansion, and capital expenditures.

391. In May 2020, the W Defendants submitted a White Paper requesting DPA funds.

68

392. The W Defendants summarized the description of their DPA request as follows:

> W International SC, LLC (W International) appreciates the opportunity to submit this white paper for $55,292,386.61 (ROM Estimate) of DPA Title III funding. Our request offers the ability to add near-immediate capability and capacity to the US nuclear shipbuilding industrial base while returning significant cost reduction to the Department of Defense (DoD) and US Navy over the life of multiple shipbuilding programs.
>
> W International's requested list of equipment and facility upgrades likely differs in nature from those of other suppliers. Whereas most suppliers may be requesting to add a specific piece of equipment to gain a unique capability, W International is requesting a variety of readily accessible manufacturing equipment to accelerate our ability to provide substantial capacity to the nuclear shipbuilding market to meet industry demands. With our proposed list of items, W International will not be adding a niche capability resulting in marginal throughput improvement; instead, we are proposing equipment that will provide capabilities to manufacture a wide variety of components essential to national defense. These added resources will add millions of manhours of capacity per year to the industrial base.
>
> The timing of this request not only supports the increase in nuclear shipbuilding demand, but will also provide much-needed employment capacity in the aftermath of the COVID-19 pandemimc-related layoffs and furloughs.
>
> This proposal provides the DoD and US Navy with three key benefits:
>
> > *1.) W International provides the only legitimate opportunity to add up to 2 million man-hours of heavy manufacturing capacity per year to the industrial base for an investment of less than $60M.*
> >
> > *2.) W International provides the only legitimate opportunity to increase industrial base capacity at a single supplier to over 3 million manhours per year within the next 4 years.*
> >
> > *3.) Government funding of the requested equipment will keep the amortized costs out of W International's burden rate, providing savings over the life of multiple programs.*

Put simply, W International is the answer to adding significant qualified manufacturing capacity to the nuclear shipbuilding industrial base quickly and affordably. Financial uncertainty and stresses attributed to COVID-19 prohibit W International from investing in these resources at this time. Without Presidential action via DPA funds, the absence of this investment places significant risk on US nuclear shipbuilding schedules over the next several years.

393.   The W Defendants stated their intention to use the DPA "funding to up-grade and expand its recently acquired manufacturing site dedicated to supporting US Navy shipbuilding."

394.   The W Defendants affirmed that Defendant W International SC's "sole purpose for purchasing the facility in South Carolina was to support EB, NNS, the US Navy, and the DoD with a focus on nuclear shipbuilding programs (Columbia, Virginia, and CVN). W International guarantees any capacity at the site to US Navy shipbuilding efforts and desires nothing more than to fill existing and future capacity with this work. W International's intention is to serve as an extension of the EB and NNS shipyards."

395.   The W Defendants stated that "[t]he benefits of investing capital funds into W International are far-reaching," including:

*Improved Competitive Rates*: Investments made with available funds will allow W International to continue to provide competitive rates by reducing the amount of capital that will be included in the burden rate if W International were to have to invest in the equipment. Without an established backlog of work and without knowing what value of funding may be awarded, it is not possible to quantify the actual savings at this time. Quantifiable savings will be estimated during the proposal stage based on response to this white paper.

*Direct Return on Investment in Critical Supply Base*: With proper funding and subsequent production awards, W International will be able to offer over 1 million manhours of capacity in 2021 increasing to over 3

million manhours annually over a 4-year period. This will save the Government and the shipyards significant costs and efforts trying to develop multiple smaller shops over the coming years, as the majority of needed outsourced work can be executed at a single shop dedicated to supporting US Navy shipbuilding. In total, the combination of lower rates, increased efficiency, and a smaller supplier base to manage will multiply the cost benefit of investing available funds at W International.

396.    The W Defendants acknowledged that they could not afford the proposed improvements to the South Carolina Facility without DPA funds.

397.    The W Defendants based this concession on the COVID-19 pandemic, which resulted "in severely limited available capital."

398.    The W Defendants proposed funding for four categories of equipment and work:

- Facility Renovation – 22 Line Items - $22.6 Million

- Fabrication Equipment – 13 Line Items - $17.9 Million

- Manpower Hiring & Development – 1 Line Item - $9.5 Million

- Material Handling Equipment – 14 Line Items - $5.3 Million

399.    The W Defendants' White Paper included an itemized list of funding request, which they "based on previous quotes, purchase orders, and internal estimates."

400.    The W Defendants stated that they were "currently soliciting formal competitive quotes for these items to be provided with the FOA proposal during the next stage of the DPA Title III process."

401.    Upon information and belief, the W Defendants submitted the White Paper to the Office of Secretary of Defense in May 2020.

71

   c.  **The Government Awards Defendant W International SC a Technology Investment Agreement and Requests a Proposal for DPA Funding**

402.  On June 16, 2020, the Government issued a Technology Investment Agreement ("TIA").

403.  The TIA was an agreement between the United States of America, through Wright-Patt, and Defendant W International SC.

404.  The TIA "issue[d] a Not-To-Exceed ["NTE"] authority for Defense Production Act (DPA) Title III Program project entitled: 'W International SC LLC Upgrade and Expansion of Existing Facility'."

405.  The TIA was undefinitized but "provide[d] authorization to proceed immediately with the proposed effort" based on Defendant W International SC's White Paper.

406.  "The anticipated period of performance, to be negotiated and definitized, for th[e] effort is 21 months, including 18 months for the technical effort and 3 months for delivery of the Final Report."

407.  The TIA stated that the Air Force would definitize the "NTE letter via a modification" to the TIA based on the following schedule:

   a.  date for submission of the qualifying proposal: 16 Jul 2020
   b.  date for the start of negotiations: 14 Aug 2020
   c.  target date for definitization: 16 Sep 2020

408.  The TIA authorized Defendant W International SC to incur costs/spend funds up to 75% of the NTE amount—$41,250,000—"prior to definitization."

72

409.  The TIA stated that "[a]ll proposed costs must be allocable, allowable and reasonable . . . ."

410.  The TIA stated that the cost principles in 48 C.F.R. § 31 and 48 C.F.R. § 231 apply to the DPA award.

411.  The TIA stated that Federal funds "shall be used only for costs that: (a) A reasonable and prudent person would incur, in carrying out the project contemplated by th[e] agreement; and (b) Are consistent with the purposes stated in the governing Congressional authorizations and appropriations."

412.  The TIA stated that any recipient who "expends $500,000 or more in one year under Federal awards . . . shall have an audit performed for that year by an independent auditor . . . ."

413.  The TIA imposed a requirement that Defendant W International SC report all subawards that obligate $25,000 or more in Federal funds.

414.  The TIA imposed various reporting requirements on Defendant W International SC's expenditure of funds and labor.

415.  The TIA imposed requirements for reporting the status of Defendant W International SC's work on the project.

416.  The TIA required Defendant W International SC to comply with Federal procurement standards and stated that Defendant W International will: "(a) Follow basic principles of business intended to produce rational decisions and fair treatment in all contracts entered into under this agreement. (b) Comply with federal statutes,

executive orders, regulations, and other legal requirements applicable to contracts entered into under th[e] agreement."

417.    The TIA contained a Statement of Objectives that contained requirements for Defendant W International SC's completion of its work and use of DPA funds.

### d. The W Defendants Submit a Proposal for Approximately $55 Million in DPA Funding

418.    As a result of the TIA, the W Defendants submitted a formal proposal on or about July 16, 2020.

419.    Matt Hines—Defendant W International SC's Chief Business Officer—signed the proposal cover page, which contained a list of 19 certifications.

420.    Defendant W International SC certified that it would, *inter alia*:

- "[G]ive the awarding agency, the Comptroller General of the United States and, if appropriate, the State, through any authorized representative, access to and the right to examine all records, books, papers, or documents related to the award, and will establish a proper accounting system in accordance with generally accepted accounting standards or agency directives."

- "[E]stablish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain."

- "[C]omply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program."

421.    Defendant W International SC submitted a 69-page proposal, which detailed, *inter alia*, Defendant W International SC's background and eligibility for DPA funding, the proposed renovation of the South Carolina Facility, the proposed use of

DPA funds, the Statement of Work ("SOW"), and a variety of technical information required by the FOA.

422. The proposal discussed the various equipment, facility renovations, and training that Defendant W International SC proposed using the DPA funding for.

423. For example, the proposal stated:

W International will be purchasing 500 weld leveling tables/supports. Due to the considerable size of the components that the company builds, the components cannot be easily lifted or maneuvered for welding access to the bottom side of the assemblies. As such, nearly all components that are fabricated must be assembled off the ground, providing clearance beneath the assemblies for welding and inspection personnel as well as lifting and handling equipment that will ultimately lift and transport the completed assemblies. W International initially had 200 weld tables, but the company has realized that even with its current volume of work, all 200 of these tables are utilized on a consistent basis. For reference, due to the size of the assemblies, some individual projects require more than 50 tables. As W International expects future volumes to reach more than ten times the current volume, the company is preparing for the increase in workload by purchasing a portion of the needed support tables with funding from this agreement.

424. In the proposal, Defendant W International SC proposed purchasing 500 Weld Tables from a supplier, rather than fabricating them in-house as it did with the SDF funding.

425. The proposal also sought approval for "approximately 65,000 man-hours of welder/personnel training."

426. Defendant W International SC stated:

W International is ideally-positioned to grow rapidly to support US Navy shipbuilding demand as well as support heavy fabrication needs of other customers. This rapid growth requires significant levels of classroom training, qualification tests, and on-the-job training. The funding will support both the growth needed to meet shipbuilding demand and

75

to support recovery from the impacts of the COVID-19 crisis in the South Carolina region.

- Will provide immediate employment opportunity for skilled laborers who have been laid off or furloughed during the COVID-19 pandemic

- Will provide training hours to bridge any volume gaps due to slowed workflow from the shipyards caused by COVID-19 impacts

- Will allow W International to maintain steady growth amid the COVID-19 disruptions

- Will provide for a ready trained workforce when the expected bow wave of nuclear shipbuilding work hits beginning in 2021

- Will provide for a larger available workforce, providing the ability to shift work from the shipyards or other suppliers in the event that COVID-19 causes shutdowns or prolonged delays on critical path components

As W International has grown to over 200 employees in less than 2 years and expects to approach 400 over the next two years, there is a considerable amount of inexperienced personnel coming onboard. While the company had a well-thought-out training plan upon starting the business, it is recognized that more training, retraining, and mentorship must be provided to such a new workforce.

Training will be further developed and provided for multiple disciplines including welding, material processing, machining, lifting and handling, ERP system, machine maintenance, and more. For training needs that cannot be provided by a current employee, subject matter experts will be hired to conduct the training.

The company realized a major weakness to its original onboarding and training plan was the lack of sufficient on-the-job training. Welders, specifically, were hired and provided roughly one month of training before reporting to the production floor. W International has recognized that most of its welders are new to Navy shipbuilding and its stringent welding requirements. While the month of training taught the welders the requirements, many hours of shop practice are required for the needed skills and techniques to become habit. More mentors and weld technicians are needed to provide oversight, guidance, and direction and new welders begin working on the shop floor. While the fundamentals are

76

taught during new hire training, welders are constantly exposed to different joint designs, welding positions, and situations as they work different jobs in production. Nearly ever job presents unique challenges and learning opportunities; it is important that W International provide the proper level of mentorship so the welders execute their craft correctly the first time and learn techniques that will make them successful going forward. As such, a major objective of this funding is to provide more training in the form of on-the-job training and shop floor practice with increased mentorship and oversight.

427. In the proposal, Defendant W International SC explained its process for obtaining quotes and competitive bids on projects.

428. Defendant W International SC certified, in the proposal, that all of its proposed costs "are allocable, allowable, and reasonable in accordance with 2 CFR 200."

429. Defendant W International SC also certified that, "[f]or all purchased and contracted items[,] W International has or will obtain a minimum of two competitive quotes prior to issuance of a purchase order."

430. Defendant W International SC certified that "[a]ll competitive quotes are available for government review at any time upon request and will be made available during any scheduled audits."

431. Defendant W International SC also submitted Appendix I to the proposal, which contained an additional set of certifications.

432. Defendant W International certified that it was a "Merchant Supplier," which is also referred to as an "open-source supplier."

433. Appendix I defined "Merchant Supplier" as a business concern that:

> (a) is a production source which manufactures, supplies, and supports the use of its products by external customers independent

77

of affiliation with internal or sister organizations; i.e., is not solely vertically integrated (restricted to supplying intra-company divisions, parent company, etc.);

(b) is committed to supporting a variety of specifications from eligible commercial and military customers;

(c) operates in a fair, equitable, and responsive manner under generally accepted business principles when responding to internal and external customers for commercial and military applications;

(d) does not, as a matter of policy, place restrictions or limitations on which eligible customers may buy or how they may subsequently use its products.

434. Defendant W International SC certified that—as a Merchant Supplier—"it shall maintain the integrity of the competitive environment between all its customers, both internal and external, through demonstrated and documented processes that safe-guard all customer confidential sourcing information (such as specifications, order quantities, pricing, delivery schedules, financing agreements, etc.) . . . ."

435. Defendant W International SC also certified that it would comply with Merchant Supplier audits, "if requested and performed by the Defense Production Act, Title III Program Office."

436. Matt Hines signed this certification on July 14, 2020 as the Chief Business Officer of Defendant W International SC.

437. In the proposal, Defendant W International SC submitted a Burden Rate Calculation spreadsheet for January through April 2020.

438. Defendant W International SC also submitted a Cost Schedule spreadsheet, which contained the invoicing schedule for each line item in the proposal.

439. Defendant W International SC also submitted a Cost Proposal spreadsheet, which stated the Government cost sharing percentage and Defendant W International SC's cost sharing percentage.

440. Defendant W International SC allocated all of the costs to the Government and stated that it would not be responsible for any of the costs.

441. Finally, Defendant W International SC included a Summary Business Plan with the proposal.

442. Upon information and belief, the proposal and all attachments were submitted to Wright-Patt on July 16, 2020 by Matt Hines.

**e. Defendant W International SC is Awarded Approximately $55 Million in DPA Funds**

443. After the W Defendants submitted the DPA proposal, they engaged in negotiations with the United States to finalize the DPA award.

444. On November 23, 2020, Wright-Patt issued a TIA Single Modification ("DPA Modification") "to definitize the subject NTE TIA issued on 16 June 2020."

445. The DPA Modification added $13,750,000 in Government funds to "fully fund the subject TIA . . . ."

446. The total Government obligation amount in the DPA Modification was $55,000,000.

447. The DPA Modification incorporated the terms and certifications in the TIA.

448. Charlotte Chumack—the United States' Agreements Officer—signed the DPA Modification on November 23, 2020.

449.    Matt Hines signed the DPA Modification on behalf of Defendant W International SC.

450.    Upon information and belief, the United States paid Defendant W International SC $55,000,000 pursuant to the terms of the TIA and DPA Modification.

451.    Upon information and belief, the W Defendants certified their compliance with the TIA, DPA Modification, federal law, and federal regulations each time they submitted an invoice for payment.

452.    Upon information and belief, the United States' payment decisions were based on these certifications.

453.    The certifications made by the W Defendants in these documents and submissions were material to the Government's payment decision.

454.    As discussed below, the W Defendants' certifications were—in many cases—false and fraudulent.

### E.  The W Defendants' Work on the Project

455.    The United States paid the W Defendants approximately $80 Million from the SDF and DPA in order to purchase equipment and supplies, expand and improve their facilities, and train their employees.

456.    The purpose of this SDF and DPA funding was to ensure that the W Defendants could provide quality work product, performed by trained employees, to the United States at a reasonable cost.

457.    As discussed below, the W Defendants:

  a.  misappropriated Government funds that were supposed to be used for the training and qualification of their employees;

80

b. grossly inflated the prices of fabricated products; and

c. upon information and belief, engaged in bid rigging by directing a DPA subcontract for grossly inflated fabricated products to a wholly owned subsidiary.

458. As discussed below, Defendant PMHE engaged in bid rigging by obtaining a DPA subcontract for grossly inflated fabricated products.

459. Defendant Electric Boat knew, or should have known, that the W Defendants were misappropriating training/qualification funding and inflating the cost of fabricated products.

460. The United States—directly and through Defendant Electric Boat—awarded the W Defendants contracts to work on Government projects, including the construction of the *Columbia* class submarines.

461. The United States was unaware of the false and fraudulent conduct of the W Defendants and Defendant PMHE when awarding these bids.

462. The false and fraudulent conduct of the W Defendants and Defendant PMHE was material to the Government's decision to award contracts and subcontracts.

463. The false and fraudulent conduct of the W Defendants and Defendant PMHE was material to the Government's payment decisions for these contracts and subcontracts.

464. The W Defendants' work product suffered as a result of their failure to properly train and qualify their welders.

465.    Upon information and belief, the Project is behind schedule due, in part, to problems with suppliers like the W Defendants.

## VI.    FACTUAL ALLEGATIONS REGARDING DEFENDANTS' FALSE CLAIMS

466.    Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

### A.  Supplier Development Fund

#### 1. Defendants Walker, W International, and W International SC Grossly Inflated the Costs of their Welded Products

467.    In the SDF Cost Spreadsheet, the W Defendants sought funding for the fabrication of Weld Tables and Weld Curtains.

468.    The W Defendants provided Defendant Electric Boat with quotes for the cost of each of these line items in the SDF Cost Spreadsheet.

469.     The W Defendants' quotes consisted of: (a) the cost of materials; and (b) the cost of labor using an hourly rate of $95.

470.    The W Defendants knowingly inflated the labor costs in these quotes in order to profit from the award of SDF funds.

471.    Upon information and belief, the W Defendants used these profits to support their operations and payroll because they were struggling financially.

### a.  Weld Tables

472.    In the September 18, 2019 Purchase Order, Defendant Electric Boat committed to purchasing 102 Weld Tables.

473.    This purchase corresponded to Line Item #62 from the SDF Cost

Spreadsheet.

474.    The W Defendants provided the following justification for Line Item #62:

Welding/leveling tables are standard shop support equipment required for proper fitup and welding of large assemblies. With the volume of expected welding work, a large quantity of tables are required.

475.    The Weld Tables that the W Defendants manufactured resembled an elevated steel I-beam.

476.    This is a picture of a Weld Table manufactured by the W Defendants:



477.    The W Defendants certified to Defendant Electric Boat—and the United States—that the cost of each Weld Table was $15,000.

478.    The W Defendants certified to Defendant Electric Boat—and the United

States—that each Weld Table required $750 in materials.

479. The W Defendants certified to Defendant Electric Boat—and the United States—that the cost of materials for 102 Weld Tables was $76,500.

480. The W Defendants certified to Defendant Electric Boat—and the United States—that each Weld Table required 150 hours of labor at $95 per hour, for a total of $14,250 in labor per Weld Table.

481. The W Defendants certified to Defendant Electric Boat—and the United States—that the cost of labor for 102 Weld Tables was $1,453,500.

482. The W Defendants certified to Defendant Electric Boat—and the United States—that the total cost for 102 Weld Tables was $1,530,000.

483. The W Defendants' labor costs for Weld Tables were grossly inflated.

484. The W Defendants' internal Weld Time Sheets show that each Weld Table required approximately 569.62 inches of welding.

485. The W Defendants' employees welded at a rate of one inch per minute.

486. Each Weld Table required 569.62 minutes—or approximately 9.49 hours—of welding.

487. Each Weld Table required 0.95 hours of welding preparation.

488. Each Weld Table required 1.9 hours of weld fitting.

489. Each Weld Table required 1.9 hours of inspection.

490. In total, each Weld Table took 14.24 hours of work.

491. At a rate of $95 per hour, the labor cost for each Weld Table was $1,352.80.

492. The actual cost for each Weld Table was $2,102.80, including $750 in materials.

493. The actual cost for the 102 Weld Tables in Line Item #62 was $214,485.60.

494. The W Defendants charged the United States $1,530,000 for the 102 Weld Tables in Line Item #62 of the SDF Cost Spreadsheet.

495. Upon information and belief, the United States paid Defendant W International SC $1,530,000 in SDF funding for these 102 Weld Tables.

496. The W Defendants knowingly overcharged the United States **$1,315,514.40** for the 102 Weld Tables in the Purchase Order.

497. Defendant Electric Boat purchased an additional 80 Weld Tables in Supplement 1 to the Purchase Order, which corresponded to a partial order of Line Item 47 in the SDF Cost Spreadsheet.

498. Using the labor and material costs above, the total cost that the W Defendants incurred for each of these Weld Tables was $2,102.80.

499. The W Defendants certified to Defendant Electric Boat—and the United States—that the cost of each of these 80 Weld Tables was $15,000.

500. The W Defendants certified to Defendant Electric Boat—and the United States—that the total cost of the 80 Weld Tables was $1,200,000.

501. Upon information and belief, the United States paid Defendant W International SC $1,200,000 in SDF funding for these 80 Weld Tables.

502. However, the W Defendants' internal records show that the actual cost

of each Weld Table was $2,102.80.

503. The W Defendants incurred an actual cost of $168,224 for these 80 Weld Tables.

504. The W Defendants knowingly overcharged the United States **$1,031,776** for the 80 Weld Tables from Supplement 1 to the Purchase Order.

505. In total, the W Defendants overcharged the United States—through Defendant Electric Boat—**$2,347,290.40** for the Weld Tables purchased with SDF funding.

506. The conditions of SDF funding prohibited the W Defendants from charging any profit on any of the materials, services, tooling, or equipment procured with SDF funds.

507. The W Defendants certified to the United States that they would not profit on any items procured with SDF funds.

508. The W Defendants' certifications were material to the United States' payment decisions.

509. The W Defendants knowingly violated the terms of the SDF funding and used the profits from fabricating Weld Tables to fund operations and payroll.

510. Given Defendant Electric Boat's experience in the shipbuilding and fabrication industries, it knew or should have known that the W Defendants' quotes for the Weld Tables were inflated and that the W Defendants were profiting off of the use of SDF funding.

### b. Weld Curtains

511.  In the September 18, 2019 Purchase Order, Defendant Electric Boat committed to purchasing 398 Weld Curtains.

512.  This purchase corresponded to Line Item #61 from the SDF Cost Spread-sheet.

513.  The W Defendants provided the following justification for Line Item #61:

Weld curtains are standard shop support equipment required for safety purposes. With the size of W International's shop and the volume of expected welding work, a large quantity of weld curtains are required.

514.  This is a picture of a Weld Curtain manufactured by the W Defendants:



515.   The W Defendants certified to Defendant Electric Boat—and the United States—that the cost of each Weld Curtain was $1,500.

516.   The W Defendants certified to Defendant Electric Boat—and the United States—that each Weld Curtain required $110.15 in materials.

517.   The W Defendants certified to Defendant Electric Boat—and the United States—that the cost of materials for 398 Weld Curtains was $43,839.70.

518.   The W Defendants certified to Defendant Electric Boat—and the United States—that each Weld Curtain required 14.63 hours of labor at $95 per hour, for a total of $1,389.85 in labor per Weld Curtain.

519.   The W Defendants certified to Defendant Electric Boat—and the United States—that the cost of labor for 398 Weld Curtains was $553,160.30.

520.   The W Defendants certified to Defendant Electric Boat—and the United States—that the total cost for 398 Weld Curtains was $597,000.

521.   The W Defendants' labor costs for Weld Curtains were grossly inflated.

522.   The Weld Curtains manufactured by the W Defendants required approximately one hour to build, with 40 minutes of welding at one inch per minute and 20 minutes for paint and assembly.

523.   At a rate of $95 per hour, the labor cost for each Weld Curtain was $95.

524.   The actual cost for each Weld Curtain was approximately $205.15—$110.15 in materials and $95 in labor.

525.   The actual cost for the 398 Weld Curtains in Line Item #61 was $81,649.70.

88

526. The W Defendants charged the United States $597,000 for the 398 Weld Curtains in Line Item #61 of the SDF Cost Spreadsheet.

527. Upon information and belief, the United States paid Defendant W International SC $597,000 in SDF funding for these 398 Weld Curtains.

528. The W Defendants knowingly overcharged the United States **$515,350.30** for the 398 Weld Curtains in the Purchase Order.

529. Defendant Electric Boat purchased an additional 101 Weld Curtains in Supplement 1 to the Purchase Order, which corresponded to a partial order of Line Item 46 in the SDF Cost Spreadsheet.

530. Using the labor and material costs above, the total cost that the W Defendants incurred for each of these Weld Curtains was $205.15.

531. The W Defendants certified to Defendant Electric Boat—and the United States—that the cost of each of these 101 Weld Curtains was $1,500.

532. The W Defendants certified to Defendant Electric Boat—and the United States—that the total cost of the 101 Weld Curtains was $151,500.

533. Upon information and belief, the United States paid Defendant W International SC $151,500 in SDF funding for these 101 Weld Curtains.

534. Using the labor and material costs detailed above, the W Defendants incurred an actual cost of $20,720.15 for these 101 Weld Curtains.

535. The W Defendants knowingly overcharged the United States **$130,779.85** for the 101 Weld Curtains from Supplement 1 to the Purchase Order.

536. In total, the W Defendants overcharged the United States—through

89

Defendant Electric Boat—**$646,130.15** for the Weld Curtains purchased with SDF funding.

537. The conditions of SDF funding prohibited the W Defendants from charging any profit on any of the materials, services, tooling, or equipment procured with SDF funds.

538. The W Defendants certified to the United States that they would not profit on any items procured with SDF funds.

539. The W Defendants' certifications were material to the United States' payment decisions.

540. The W Defendants knowingly violated the terms of the SDF funding and used the profits from fabricating Weld Curtains to fund operations and payroll.

541. Given Defendant Electric Boat's experience in the shipbuilding and fabrication industries, it knew or should have known that the W Defendants' quotes for the Weld Curtains were inflated and that the W Defendants were profiting off of the use of SDF funding.

## 2. Defendants Walker, W International, and W International SC Manipulated their Training Hours to Profit from Training Welders

542. In the September 18, 2019 Purchase Order, Defendant Electric Boat committed to fund the training and qualification of 75 welders.

543. This purchase corresponded to Line Item #63 from the SDF Cost Spreadsheet.

544. The W Defendants provided the following justification for Line Item #63:

After passing classroom testing, each welder is required to perform shop weld training and take their initial HY-80 weld qualification(s). Each welder's test plate(s) must be non-destructively and destructively tested. Welders must pass these tests to be qualified to weld on all EB and NNS components.

545. The W Defendants certified to Defendant Electric Boat—and the United States—that each of the 75 welders needed 160 hours of training at $95 per hour.

546. The training costs of each welder were $15,200.

547. The total training costs of 75 welders was $1,140,000.

548. In Supplement 1 to the Purchase Order, Defendant Electric Boat committed to fund the training and qualification of an additional 75 welders.

549. This purchase corresponded to a partial order of Line Item #48 from the SDF Cost Spreadsheet.

550. The W Defendants certified to Defendant Electric Boat—and the United States—that each of the 75 welders needed 160 hours of training at $95 per hour.

551. The training costs of each welder were $15,200.

552. The total training costs of 75 welders was $1,140,000.

553. In total, the W Defendants charged the United States $2,280,000 for the training and qualification of 150 welders.

554. Upon information and belief, the United States paid Defendant W International SC $2,280,000 in SDF funding for the training and qualification of 150 welders.

555. The W Defendants did not conduct a program of training and qualification with the SDF funding for these welders.

91

556.   Instead, the W Defendants primarily trained these 150 welders using "on the job training."

557.   The W Defendants instructed these 150 welders to work on pending fabrication projects to accomplish their training.

558.   Many of these projects were the subject of fixed-price (i.e., labor + materials) contracts between Defendant W International SC and the Government, Defendant Electric Boat, and/or Newport News Shipbuilding.

559.   The W Defendants were, thus, already being paid separate labor costs on those fixed-price projects.

560.   Some of the fixed-price projects that the welders-in-training worked on were the result of Government contracts related to the Project.

561.   For example, the W Defendants instructed these welders-in-training to work on Weld Tables and Weld Curtains.

562.   Defendant W International SC was already being paid (from SDF and DPA funding) for labor and materials for the Weld Tables and Weld Curtains.

563.   The W Defendants instructed the welders-in-training to log their work hours as labor hours on the projects and as SDF training hours.

564.   This allowed the W Defendants to double bill the Government and Defendant Electric Boat.

565.   The W Defendants also had these welders-in-training work on fixed-price contracts for other Government contractors, including BWX Technologies ("BWXT").

566. BWXT contracted with Defendant W International SC to produce missile tubes.

567. Upon information and belief, labor costs were built into the price of Defendant W International SC's contract with BWXT.

568. Upon information and belief, the W Defendants double billed the United States—through BWXT—for welders-in-training who were performing labor on fixed price contracts.

569. By using welders-in-training to do the work on Government contracts, the W Defendants did not have to use the labor funding built into those contracts to pay trained welders.

570. This allowed the W Defendants to double bill the Government and profit from the SDF funding.

571. The conditions of SDF funding prohibited the W Defendants from charging any profit on any of the materials, services, tooling, or equipment procured with SDF funds.

572. The W Defendants certified to the United States that they would not profit on any items procured with SDF funds.

573. The W Defendants' certifications were material to the United States' payment decisions.

574. The W Defendants knowingly violated the terms of the SDF funding and used the profits from double billing training hours to fund operations and payroll.

575. Given Defendant Electric Boat's experience in the shipbuilding and

fabrication industries, it knew or should have known that the W Defendants were double billing training hours.

### 3. Defendant Electric Boat Knew, or Should Have Known, About this Fraud

576. Defendant Electric Boat administered the SDF funding for the W Defendants' Weld Tables, Weld Curtains, and training/qualification of welders.

577. Defendant Electric Boat has been in the shipbuilding business for more than 100 years.

578. Defendant Electric Boat is the United States Navy's primary designer and builder of submarines.

579. Upon information and belief, Defendant Electric Boat receives most of its revenue from the United States.

580. Defendant Electric Boat frequently serves as the prime contractor or subcontractor on shipbuilding projects for the United States Navy.

581. In its role as prime contractor or subcontractor on shipbuilding projects, Defendant Electric Boat contracts with subcontractors like the W Defendants.

582. Before issuing a purchase order, Defendant Electric Boat has an obligation to ensure that subcontractors are submitting accurate and reasonable bills to the United States.

583. Defendant Electric Boat is the prime contractor on the Project.

584. Upon information and belief, Defendant Electric Boat employs thousands of welders for shipbuilding projects.

585. Upon information and belief, Defendant Electric Boat's sole business is

shipbuilding, and it is aware of the reasonable costs of basic welded products like Weld Tables and Weld Curtains.

586. Upon information and belief, Defendant Electric Boat has administered thousands of contracts and subcontracts for shipbuilding projects and is aware of the reasonable costs of products like Weld Tables and Weld Curtains.

587. Given its experience administering Government contracts, Defendant Electric Boat is aware of the federal statutes, regulations, and contractual provisions governing the pricing of fabricated products like Weld Tables and Weld Curtains.

588. Upon information and belief, given its background in shipbuilding and design, Defendant Electric Boat knew or should have known that the W Defendants' labor costs for the Weld Tables were inflated.

589. The W Defendants certified to Defendant Electric Boat that *each* Weld Table took 150 hours of welding to fabricate.

590. Defendant Electric Boat knew, or should have known, that that is almost four weeks of full-time work for one welder on *each* Weld Table.

591. Upon information and belief, Defendant Electric Boat knew or should have known that these labor costs were inflated in light of the minimal welding needed to complete a Weld Table.

592. Upon information and belief, Defendant Electric Boat had employees on site at the South Carolina Facility overseeing the W Defendants' work on the Project.

593. Upon information and belief, Defendant Electric Boat—through its employees—observed the Weld Tables at the South Carolina Facility.

95

594. Upon information and belief, Defendant Electric Boat knew, or should have known, that the W Defendants' labor costs for the Weld Tables were inflated.

595. Defendant Electric Boat had an obligation to alert the United States about the W Defendants inflating labor costs on the Weld Tables.

596. Upon information and belief, Defendant Electric Boat did not alert the United States that the W Defendants inflated the labor costs on the Welding Tables.

597. Upon information and belief, Defendant Electric Boat paid Defendant W International SC for the Weld Tables using SDF funds despite knowing that the costs were inflated.

598. Upon information and belief, given its background in shipbuilding and design, Defendant Electric Boat knew or should have known that the W Defendants' labor costs for the Weld Curtains were inflated.

599. The W Defendants certified to Defendant Electric Boat that *each* Weld Curtain took 14.63 hours of welding to fabricate.

600. Defendant Electric Boat knew, or should have known, that that is almost two full days of work for one welder on *each* Weld Curtain.

601. Upon information and belief, Defendant Electric Boat knew or should have known that these labor costs were inflated in light of the minimal welding needed to complete a Weld Curtain.

602. Upon information and belief, Defendant Electric Boat had employees on site at the South Carolina Facility overseeing the W Defendants' work on the Project.

603. Upon information and belief, Defendant Electric Boat—through its

employees—observed the Weld Curtains at the South Carolina Facility.

604. Upon information and belief, Defendant Electric Boat knew, or should have known, that the W Defendants' labor costs for the Weld Curtains were inflated.

605. Defendant Electric Boat had an obligation to alert the United States about the W Defendants inflating labor costs on the Weld Curtains.

606. Upon information and belief, Defendant Electric Boat did not alert the United States that the W Defendants inflated the labor costs on the Welding Curtains.

607. Upon information and belief, Defendant Electric Boat paid Defendant W International SC for the Weld Curtains using SDF funds despite knowing that the costs were inflated.

608. Upon information and belief, given its background in shipbuilding and its presence at the South Carolina Facility, Defendant Electric Boat knew or should have known that the W Defendants were double invoicing for welders-in-training working on fixed-cost projects.

609. Upon information and belief, Defendant Electric Boat raised concerns about the quality of the W Defendants' welders' work.

610. For example, as discussed below, the W Defendants' work on a Missile Command and Control Module Deck for Defendant Electric Boat was sub-par and failed numerous inspections when it was shipped to Rhode Island.

611. Defendant Electric Boat had an obligation to ensure that the W Defendants were using the SDF funding appropriately and not profiting from the fabrication

of equipment of training of employees.

612. Upon information and belief, Defendant Electric Boat knowingly allowed the W Defendants to profit from the SDF funding.

**B. Defense Production Act**

    **1. Defendants Walker, W International, W International SC, and PMHE Engaged in Bid Rigging and Grossly Inflated the Costs of Weld Tables**

613. The W Defendants requested DPA funding for the fabrication of 500 Weld Tables.

614. The W Defendants certified to the United States that they sought competitive quotes for the fabrication of these 500 Weld Tables.

615. Upon information and belief, the W Defendants certified to the United States that they obtained competitive quotes from three vendors.

616. On June 24, 2020, Scion Steel of Warren, Michigan provided the W Defendants with a quote for the fabrication of 500 Weld Tables.

617. Scion Steel is a long-time supplier of the W Defendants.

618. Scion Steel quoted the W Defendants $15,765 for each Weld Table for a total cost of $7,882,500.

619. The W Defendants received Scion Steel's quote on June 25, 2020.

620. On June 24, 2020, Three D Metal Works of Andrews, South Carolina provided the W Defendants with a quote for the fabrication of 500 Weld Tables.

621. Three D Metal Works quoted the W Defendants $15,475 for each Weld Table for a total cost of $7,737,500.

622. The W Defendants received Three D Metal Works quote on June 25, 2020.

623. On June 24, 2020, Defendant PMHE of Inkster, Michigan provided the W Defendants with a quote for the fabrication of 500 Weld Tables.

624. Defendant PMHE provided the lowest quote—$14,950 for each Weld Table for a total cost of $7,475,000.

625. The W Defendants received Defendant PMHE's quote on June 26, 2020.

626. Upon information and belief, Defendant W International SC represented to the United States that these quotes were competitively sourced.

627. Upon information and belief, the quotes were not competitively sourced.

628. Upon information and belief, the W Defendants engaged in bid rigging to ensure that Defendant PMHE received the subaward for the production of the 500 Weld Tables.

629. Defendant PMHE is a wholly owned subsidiary of Defendant W International.

630. Upon information and belief, Defendant W International SC did not disclose its relationship with Defendant PMHE to the United States when seeking DPA funding.

631. Upon information and belief, the W Defendants coordinated these quotes to include significantly inflated costs.

632. Upon information and belief, the W Defendants ensured that Defendant PMHE's inflated quote was the lowest of the three quotes.

633.    Defendant W International SC awarded the contract to its sister company, Defendant PMHE.

634.    Defendant PMHE's quote was grossly inflated.

635.    The following is a picture of the Weld Tables produced by Defendant PMHE:



636.    Upon information and belief, the cost of the steel for these Weld Tables was approximately $750.

637.    Upon information and belief, each Weld Table required approximately 144 inches of welding.

638.    A trained welder can weld one inch per minute.

639. A trained welder could finish 144 inches of welding in approximately 2.4 hours.

640. Upon information and belief, at an hourly rate of $95 per hour, the labor costs for these Weld Tables was approximately $228.

641. Upon information and belief, the total cost for these Weld Tables should have been approximately $978 per Weld Table.

642. Defendant PMHE charged the United States $14,950 per Weld Table.

643. Defendant PMHE charged the United States a total of $7,475,000 for 500 Weld Tables.

644. Upon information and belief, the United States paid Defendant PMHE $7,475,000 for the fabrication of the 500 Weld Tables.

645. Upon information and belief, the United States was not aware that Defendant PMHE was a wholly owned subsidiary of Defendant W International.

646. The DPA Modification required "[a]ll proposed costs [to] be allocable, allowable and reasonable . . . ."

647. The DPA Modification stated that Federal funds "shall be used only for costs that: (a) A reasonable and prudent person would incur, in carrying out the project contemplated by th[e] agreement; and (b) Are consistent with the purposes stated in the governing Congressional authorizations and appropriations."

648. Defendant PMHE's quote for the Weld Tables was inflated and unreasonable.

649. Upon information and belief, the W Defendants awarded the contract

for the Weld Tables to Defendant PMHE in order to retain inflated profits within the corporate umbrella of Defendant W International.

650. Federal law also requires contractors to "make maximum practicable use of competition, or . . . other means that ensure reasonable cost for procured goods and services." 32 C.F.R. § 34.31.

651. The United States paid for the 500 Weld Tables based on the representations and certifications of the W Defendants and Defendant PMHE that the cost was reasonable and competitively sourced.

652. These false and fraudulent representations and certifications were material to the Government's payment decision.

### 2. Defendants Walker, W International, W International SC, and PMHE Grossly Inflated the Costs of Power Carts

653. The W Defendants requested DPA funding for 50 Power Carts.

654. The following is an image of a Power Cart:



655. The Power Carts are welded frames with a purchased electrical transformer and outlet connections.

656. The Power Carts were used in the South Carolina Facility to provide mobile access to various levels of power throughout the buildings.

657. Defendant PMHE quoted the W Defendants a price of $26,975 for each Power Cart, for a total of $1,348,750.

658. Defendant W International SC awarded the contract for these Power Carts to Defendant PMHE.

659. Upon information and belief, Defendant PMHE inflated the costs for the fabrication of this Power Cart.

660. Upon information and belief, a reasonable cost for each Power Cart was approximately $6,000.

661. Upon information and belief, the W Defendants awarded the contract for the Power Carts to Defendant PMHE in order to retain inflated profits within the corporate umbrella of Defendant W International.

662. The Government paid Defendant PMHE based on the W Defendants' false and fraudulent representations and certifications that Defendant PMHE's price was reasonable.

663. These representations and certifications were material to the Government's payment decision.

**3. Defendants Walker, W International, and W International SC Manipulated their Training Hours to Profit from Training Welders**

664.    The United States awarded Defendant W International SC more than $9,000,000 for the training and qualification of its welders.

665.    The United States awarded Defendant W International SC DPA funding for 65,000 hours of training for welders at $95 per hour.

666.    This award corresponds to Line Item #36 on the Itemized DPA Funding Spreadsheet that the W Defendants, upon information and belief, submitted to the United States.

667.    The total cost to the United States for this line item was $6,175,000.

668.    The United States awarded Defendant W International SC DPA funding for 32,640 support hours for welders at $95 per hour.

669.    This award corresponds to Line Item #72 on the Itemized DPA Funding Spreadsheet that the W Defendants, upon information and belief, submitted to the United States.

670.    In total, the United States awarded Defendant W International SC $9,275,800 in DPA funds for training and support of welders.

671.    Upon information and belief, the United States paid Defendant W International SC $9,275,800 for the training and support of welders pursuant to the DPA.

672.    The W Defendants certified to the United States that these funds would be used for training and support of welders.

673.    The W Defendants did not conduct a program of training and qualification with the DPA funding for these welders.

674.    Instead, the W Defendants primarily trained their welders using "on the job training" by having them work on pending fabrication projects.

675.    Many of these projects were the subject of fixed-price (i.e., labor + materials) contracts between Defendant W International SC and the Government, Defendant Electric Boat, Newport News Shipbuilding, or other Government contractors/subcontractors.

676.    The W Defendants instructed these welders-in-training to log both training hours and labor hours for the projects on which they were working.

677.    For example, the W Defendants instructed these welders-in-training to work on Weld Tables and Weld Curtains.

678.    Defendant W International SC was already being paid (from SDF and DPA funding) for labor and materials for the Weld Tables and Weld Curtains.

679.    The W Defendants instructed the welders-in-training to log their work hours as labor hours on the projects and as DPA training and/or support hours.

680.    This allowed the W Defendants to double bill the Government, Defendant Electric Boat, and Newport News Shipbuilding.

681.    The W Defendants also had these welders-in-training work on fixed-price contracts for other Government contractors, including BWX Technologies ("BWXT").

682.    BWXT contracted with Defendant W International SC to produce

105

missile tubes.

683.    Upon information and belief, labor costs were built into the price of Defendant W International SC's contract with BWXT.

684.    Upon information and belief, the W Defendants double billed the United States—through BWXT—for welders-in-training who were performing labor on fixed price contracts.

685.    By using welders-in-training to do the work on Government contracts, the W Defendants did not have to use the labor funding built into those contracts to pay trained welders.

686.    This allowed the W Defendants to use the training and support DPA funding for operations and other expenses since the work the welders-in-training were doing was already built into the fixed-price projects.

687.    Upon information and belief, the W Defendants submitted invoices to the United States that misrepresented that the DPA funds were used for training and support.

688.    The W Defendants certified to the United States that they were complying with the terms of the DPA Modification and with federal statutes, regulations, and other legal requirements.

689.    The W Defendants certified to the United States that they would use DPA funds for costs that "[a] reasonable and prudent person would incur, in carrying out the project contemplated . . . [and that] [a]re consistent with the purposes stated in the governing Congressional authorizations and appropriations."

690. These certifications were material to the United States' payment decisions.

691. The W Defendants knowingly violated the terms of the DPA funding and used the profits from double billing training hours to fund operations and payroll.

### C. Defendants Walker, W International, and W International SC Retaliate Against Relator and Terminate His Employment

692. As the COO, Relator was focused on ensuring that Defendant W International SC fabricated quality products in a safe and efficient manner.

693. Given the scale of Defendant W International SC's work on the Project, Relator attempted to implement training, inspection, and documentation processes to ensure quality control.

694. During several meetings, Relator voiced concerns about Defendant W International SC's failure to properly train welders and inspect and document the status of ongoing projects.

695. Defendant Walker and Defendant W International SC's leadership reprimanded Relator whenever he raised concerns about the lack of training and quality control.

696. As a result of Relator expressing concerns about the lack of training and quality control, Defendants Walker and W International SC demoted Relator to Chief Quality Officer.

697. This constituted a change in the terms and conditions of Relator's employment.

698. Relator was no longer involved in the operational management of

107

Defendant W International SC, and was instead instructed to focus on the fabrication and production.

699. Relator also expressed concerns that Defendant W International SC was improperly profiting from the SDF, which could constitute cause for default on the Purchase Order with Defendant Electric Boat.

700. Relator also expressed concerns about Defendant W International SC's use of the DPA funds.

701. During several meetings, Defendant Walker instructed Relator not to worry about Defendant W International SC's use of the SDF and DPA funding.

702. Defendant W International SC began its first large welding job for the Project in the summer of 2020.

703. This welding job was the fabrication and production of a Missile Command and Control Module Deck ("Deck") for a *Columbia* class submarine.

704. Defendant W International SC's welders did not have the proper training or qualifications to complete the job.

705. This lack of training and quality control caused many production delays, interruptions, and mistakes.

706. This lack of training and quality control was a direct result of Defendant W International SC misappropriating the SDF and DPA funds and failing to meet its contractual training obligations.

707. Defendant Electric Boat had approximately 20 to 30 personnel on site at Defendant W International SC during the production of the Deck.

708.    Defendant Electric Boat's employees participated in, and oversaw, the fabrication, welding, and inspections of the Deck.

709.    Defendant Electric Boat finished its final review and inspection of the Deck by March 31, 2021.

710.    Defendant Electric Boat took possession of the Deck and was responsible for transporting it to Rhode Island by barge.

711.    Upon arrival at Defendant Electric Boat's docks, the Deck was filled with sea water and rusted.

712.    Defendant Electric Boat requested that Defendant W International SC send a team to Rhode Island to support a cleanup of the Deck and to perform a reinspection of some welds.

713.    When Relator arrived in Rhode Island, he learned that Defendant Electric Boat applied a much higher level of scrutiny to the fabrication than their employees had during the pre-shipping inspection.

714.    Defendant Electric Boat claimed that many of the welds were deficient.

715.    The cleanup and reinspection took several months in the summer of 2021.

716.    Shortly after Relator returned to South Carolina, on September 23, 2021, Jim Logan—Defendant W International SC's President—told Relator that his employment was being terminated and gave him the option to resign.

717.    On September 23, 2021, Defendant W International SC was meeting with the U.S. Navy and Defendant Electric Boat to discuss how Defendant W

International SC's processes and procedures would change on future fabrication projects.

718.    Relator was uninvited from the meeting and was presented with two letters by Logan.

719.    One letter began: "Based on continued nonperformance your employment with W International will terminate on October 31, 2021."

720.    The other letter began: "Based on continued nonperformance your employment with W International the company would like to provide you the opportunity to resign from your position effective Oct 31, 2021."

721.    The remainder of the two letters are identical, with Defendant W International SC agreeing to pay Relator his salary through the end of 2021, relocation expenses, expenses associated with terminating his apartment lease in South Carolina, and a "special distribution of 1% of the net proceeds in the event of a sale of the company before December 31, 2024."

722.    The letters state that Relator's employment with "W International" was being terminated, but the letters are on Defendant W International SC's letterhead.

723.    Defendant W International SC did not provide any detail about what issues of "continued nonperformance" Relator was causing.

724.    Relator informed Defendant W International SC that he would leave by October 31, 2021 as requested.

## COUNT I
### Violations of the FCA: Presenting or Causing the Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(A)
### (Against All Defendants)

725.    Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

726.    In pertinent part, the FCA establishes liability for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

727.    Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

728.    By virtue of the acts described above, the Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees, or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

729.    The United States was unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants.

730.    In reliance on the accuracy of the claims, information, records, and certifications submitted or caused to be submitted by Defendants, the United States paid claims that would not be paid if Defendants' illegal conduct was known.

111

731.     As a result of Defendants' acts, the United States sustained damages and therefore is entitled to treble damages under the FCA to be determined at trial.

732.     Additionally, the United States is entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

**COUNT II**
**Violations of the FCA: Use of False Record or Statement Material to a False Claim**
**31 U.S.C. § 3729(a)(1)(B)**
**(Against All Defendants)**

733.     Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

734.     In pertinent part, the FCA establishes liability for "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B).

735.     By virtue of the acts described above, Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, used, or caused to be made or used, a false record and statements.

736.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

737.     As detailed above, the W Defendants' records and statements were false in that they purported to show compliance with SDF and DPA requirements, the SDF

Purchase Order and Supplements with Defendant Electric Boat, the DPA Modification, Federal Acquisition Regulations, accounting standards applicable to Government contracting, federal statutes, and federal regulations.

738. As detailed above, Defendant Electric Boat's records and statements were false in that they purported to show compliance with SDF requirements, the Prime Contract (as modified and supplemented), Federal Acquisition Regulations, accounting standards applicable to Government contracting, federal statutes, and federal regulations.

739. As detailed above, Defendant PMHE's records and statements were false in that they purported to show compliance with DPA requirements, the DPA Modification, its purchase orders with Defendant W International SC, Federal Acquisition Regulations, accounting standards applicable to Government contracting, federal statutes, and federal regulations.

740. These records and statements were material to a false or fraudulent claim.

741. Defendants knowingly made, used, or caused to be made or used these false records or statements with the intent to get or cause these false claims to be paid by the United States.

742. The United States was unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by the Defendants

743. The United States paid claims that would not be paid if Defendants' illegal conduct was known.

113

744. By virtue of this conduct, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial.

745. Additionally, the United States is entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

## COUNT III
**Violations of the FCA: Conspiring to Submit False Claims**
**31 U.S.C. § 3729(a)(1)(C)**
**(Against Defendants W International, W International SC, Walker, and Electric Boat)**

746. Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

747. In pertinent part, the FCA establishes liability for "any person who . . . conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

748. By virtue of the acts described above, Defendants, acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

749. The W Defendants and Defendant Electric Boat conspired to withhold information regarding their failure to comply with the Prime Contract, SDF require-ments, Defendant W International SC's Purchase Order and Supplements with

114

Defendant Electric Boat, Federal Acquisition Regulations, accounting standards applicable to Government contracting, federal statutes, and federal regulations.

750. As a result, the United States was unaware of the false claims submitted and caused to be submitted by the Defendants, and the United States paid claims that would not be paid if the Defendants' illegal conduct was known to the United States.

751. By virtue of this conduct, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial.

752. Additionally, the United States is entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

**COUNT IV**
**Violations of the FCA: Submission of Express and Implied False Certifications**
**31 U.S.C. § 3729(a)(1)(B)**
**(Against All Defendants)**

753. Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

754. In pertinent part, the FCA establishes liability for "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

755. As detailed above, the W Defendants expressly and/or impliedly certified compliance with SDF and DPA requirements, the SDF Purchase Order and

115

Supplements with Defendant Electric Boat, the DPA Modification, Federal Acquisition Regulations, accounting standards applicable to Government contracting, federal statutes, and federal regulations.

756. As detailed above, Defendant Electric Boat expressly and/or impliedly certified compliance with SDF requirements, the Prime Contract (as modified and supplemented), Federal Acquisition Regulations, accounting standards applicable to Government contracting, federal statutes, and federal regulations.

757. As detailed above, Defendant PMHE expressly and/or impliedly certified compliance with DPA requirements, the DPA Modification, its purchase orders with Defendant W International SC, Federal Acquisition Regulations, accounting standards applicable to Government contracting, federal statutes, and federal regulations.

758. These certifications were express and/or implied conditions of payment by the United States.

759. Defendants express and implied certifications of compliance with these laws, regulations, standards, and contracts was knowingly false.

760. The United States, unaware of the falsity of the records, statements, certifications and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct, and the Defendants' illegal conduct was material to the Government's decision to pay claims.

761. By virtue of this conduct, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial.

762. Additionally, the United States is entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

**COUNT V**
**Violations of the FCA: Conversion**
**31 U.S.C. § 3729(a)(1)(D)**
**(Against Defendants W International, W International SC, Walker, and PMHE)**

763. Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

764. In pertinent part, the FCA establishes liability for "any person who . . . has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property . . . ." 31 U.S.C. § 3729(a)(1)(D).

765. As detailed above, the W Defendants falsely inflated the labor costs of various fabricated metal products, misappropriated millions of dollars in funds that were earmarked for training welders, and, upon information and belief, engaged in bid rigging to award Government contracts to Defendant W International's wholly owned subsidiary—Defendant PMHE.

766. As detailed above, Defendant PMHE inflated the labor costs of various fabricated metal products and, upon information and belief, engaged in bid rigging to

117

receive Government contracts from its sister company—Defendant W International SC.

767. By virtue of the acts described above, the Defendants had possession, custody and/or control of property and/or money used, or to be used, by the Government and knowingly delivered, and/or caused to be delivered, less than all of that money or property within the meaning of 31 U.S.C. § 3729(a)(1)(D).

768. The United States was unaware of the Defendants' conversion of Government property and funds.

769. As a result of Defendants' acts, the United States sustained damages and therefore is entitled to treble damages under the FCA to be determined at trial.

770. Additionally, the United States is entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

## COUNT VI
### Violations of the FCA Anti-Retaliation Provision
### 31 U.S.C. § 3730(h)
### (Against Defendants W International, W International SC, and Walker)

771. Relator re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

772. Defendant Walker hired Relator as the COO of Defendant W International SC.

773. Relator raised concerns about Defendant W International SC's failure to properly train welders, implement quality control measures, and inspect its products.

118

774.    Defendant W International SC was not properly training welders due to its misappropriation of Government funds allotted for welder training.

775.    After Relator raised these concerns, the W Defendants demoted Relator to Chief Quality Officer.

776.    Relator made significant efforts to stop the W Defendants' false and fraudulent conduct and misappropriation of Government funds.

777.    This change in the terms and conditions of Relator's employment was directly and proximately caused by his failed attempts to implement training, inspection, and documentation processes to ensure quality control.

778.    When Defendant W International SC began its first large welding job—fabrication of the Deck—the welders were not properly trained or qualified to perform the necessary work.

779.    Defendant Electric Boat shipped the Deck to Rhode Island and found that it was filled with sea water, rusted, and had many problematic welds.

780.    When Relator returned to South Carolina, the W Defendants terminated his employment.

781.    Relator was notified about the termination immediately prior to a meeting with the U.S. Navy and Defendant Electric Boat about the need to change Defendant W International SC's processes and procedures for future projects.

782.    Upon information and belief, the W Defendants terminated Relator's employment in retaliation for him raising issues about the lack of training, qualification, and inspections and the misappropriation of Government funds.

783.    Relator Klausmeier has suffered significant injuries as a result of the W Defendants' retaliation.

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

a.  That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the FCA provides;

b.  That civil penalties in the maximum amount allowable by law be imposed for each and every false claim that Defendants presented to the United States and/or its agencies;

c.  That Relators be awarded damages as a result of Defendants W International, W International SC, and Walker's retaliation;

d.  That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, expert fees, and expenses which Relator necessarily incurred in bringing and pressing this case;

e.  That the Court grant permanent injunctive relief to prevent the ongoing violations of the FCA for which redress is sought in this Complaint;

f.  That Relator be awarded the maximum amount (i.e., relator's share) allowed to him pursuant to the FCA; and

g.  That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims triable alleged herein.

**[Signature Page Follows]**

Respectfully submitted by:

**LAW OFFICE OF BILL NETTLES**
*Attorneys for Relator*

/s/John L. Warren III
William N. Nettles (D.S.C. Federal ID No. 6586)
Frances C. Trapp (D.S.C. Federal ID No. 6376)
John L. Warren III (D.S.C. Federal ID No. 12164)
2008 Lincoln Street
Columbia, South Carolina 29201
Telephone: (803) 814-2826

May 9, 2022